UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS *ex rel.* LORINE LAGATTA, M.D., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) |
| REDITUS LABORATORIES, LLC; COUNTY ANESTHESIA SC dba TRI-COUNTY PATHOLOGY; MDXHEALTH, INC.; MYRIAD GENETICS LABORATORIES, INC.; MIDWEST UROLOGICAL GROUP, LTD; AJR DIAGNOSTICS, LLC; AJR MD CONSULTING, LLC; RLL AVIATION LLC; PR MANUFACTURING ENTERPRISES LLC; AARON ROSSI; JOSEPH J. BANNO, M.D.; BRYAN ZOWIN; LAWRENCE ROSSI, M.D.; and their successors and assigns, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 1:22-cv-01203-SLD-JEH

ORDER

Before the Court are motions to dismiss filed by Defendants Myriad Genetics

Laboratories, Inc. ("Myriad"), ECF No. 33; Bryan Zowin, ECF No. 46; Lawrence Rossi, M.D.

("Lawrence") and Tri County Anesthesia, S.C. d/b/a Tri-County Pathology Group ("Tri

County"), ECF No. 48; Joseph J. Banno, M.D. and Midwest Urological Group, Ltd.

("Midwest"), ECF No. 50; Reditus Laboratories, LLC ("Reditus"), ECF No. 63; Aaron Rossi

("Aaron"), AJR Diagnostics, LLC ("AJR Diagnostics"), AJR MD Consulting, LLC ("AJR

Consulting"), RLL Aviation, LLC ("RLL Aviation"), and PR Manufacturing LLC ("PR

Manufacturing"), ECF No. 71; and MDxHealth, Inc. ("MDx"), ECF No. 79, as well as motions

1

for leave to file replies filed by Myriad, ECF No. 86; Zowin, ECF No. 82; Lawrence and Tri

County, ECF No. 84; Banno and Midwest, ECF No. 83; Reditus, ECF No. 85; and MDx, ECF

No. 92.  For the following reasons, the motions for leave to file replies are GRANTED; the

motions to dismiss filed by Myriad, MDx, and Zowin are GRANTED; and the remaining four

motions to dismiss are GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

Relator, Dr. Lorine LaGatta, brings this *qui tam* action on behalf of the United States and

the State of Illinois, alleging Defendants violated the federal False Claims Act ("FCA"), 31

U.S.C. §§ 3729–33, the Illinois False Claims Act ("IFCA"), 740 ILCS 175/1–8, the Anti-

Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), the Physician Self-Referral Law ("Stark

Law"), 42 U.S.C. § 1395nn, the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18

U.S.C. § 220, and the Illinois Insurance Claims Fraud Prevention Act ("IICFPA"), 740 ILCS

92/1–45.  Relator also brings claims on her own behalf for breach of contract; retaliation in

violation of the FCA, IFCA, IICFPA, and Illinois Whistleblower Act ("IWA"), 740 ILCS

174/10–40; and violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820

ILCS 115/1–15.

Relator alleges a series of fraudulent schemes among Defendants involving illegal

referrals, kickbacks, and false claims.  At the center of these schemes is Reditus, a medical

laboratory in Pekin, Illinois founded in 2019.  Reditus capitalized on the COVID-19 pandemic

and financially prospered by bilking the government and private insurers.  As a result of

---

[1] When reviewing a motion to dismiss, the court "accept[s] all facts alleged in the complaint as true and draw[s] all reasonable inferences from those facts in favor of the plaintiff."  *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015). The factual background is therefore drawn from the Second Amended Complaint, ECF No. 21.  The paragraphs in the Second Amended Complaint are inconsistently numbered, specifically on pages 6–7.  The Court uses the paragraph numbers provided by Relator but notes this inconsistency.

Defendants' fraud, Reditus went from having almost no revenue to over $200 million.  From May 2021 until June 15, 2022, Relator worked as an anatomic pathologist for Reditus and for Tri County, an entity that provided pathologist services and support to Reditus.  Aaron is the founder and CEO of Reditus.  Aaron's father Lawrence is the owner and president of Tri County as well as the president of Reditus.

Reditus referred all its pathology testing cases to Tri County so as to keep laboratory revenue in the Rossi family.  Reditus also paid virtually all of Tri County's operating expenses— including salaries, insurance, and significantly discounted rent—which "effectively resulted in Tri[]County having a medical practice with almost no expenses."  Second Am. Compl. ¶ 73, ECF No. 21.  Additionally, Reditus paid Tri County $25,000 per month purportedly in exchange for Lawrence's services as clinical medical director of Reditus, but Lawrence performed no such services.  Reditus, Aaron, and Lawrence submitted thousands of false claims for payment to Medicare, the State of Illinois, and private insurers for services performed by non-credentialed pathologists under the names of credentialed physicians who had nothing to do with those services.  They also overbilled and submitted false claims for routine COVID-19 tests and other clinical tests.  Additionally, Aaron and Reditus set up Reditus's billing software to auto-populate a certain charge or diagnosis code when work had not actually been performed nor had a diagnosis been made.

AJR Diagnostics, AJR Consulting, RLL Aviation, and PR Manufacturing are alter egos of Aaron formed to avoid liability.  AJR Diagnostics is a laboratory formed by Aaron and Lawrence on October 19, 2022 "to defraud creditors and to divert/retain government funds that were fraudulently obtained . . . as Reditus was involved in protracted litigation and Aaron Rossi was under a federal criminal indictment."  *Id.* ¶ 16.  AJR Consulting and RLL Aviation are

entities Aaron formed to shield his fraudulently obtained assets—including airplanes and luxury vehicles—from creditors.

Banno, a urologist and former or current partner of Midwest, regularly referred his patients to Reditus for urology testing. In exchange for the referrals, Banno received $15,000 every quarter as a kickback, though it was dubbed a "consulting fee." *Id.* ¶ 116. Zowin worked for Reditus and helped coordinate the fraudulent financial arrangements between Midwest and Reditus. Zowin's wife is Banno's niece and she was hired by Banno to do billing for Midwest. Zowin would tell his wife how to create fictitious invoices billing by the hour for Banno's "consulting" work so as not to arouse suspicion. For this work, Reditus paid Zowin $500,000 per year and a bonus of 3% of Reditus's revenue. Zowin also brokered a relationship involving kickbacks made to Reditus for referrals made by Banno to two out-of-state laboratories, MDx and Myriad.

While employed at Tri County and Reditus, Relator investigated, documented, and expressed opposition to Defendants' fraudulent billing practices. Aaron and Lawrence harassed and threatened Relator in an attempt to silence her and prevent her from revealing their fraud. On June 15, 2022, the Reditus Defendants (Aaron, Lawrence, and Reditus) and Tri County fired Relator "in retaliation for her investigatory and opposition conduct." *Id.* ¶ 177.

On June 17, 2022, Relator filed a complaint on behalf of the United States and the State of Illinois under seal as required by 31 U.S.C. § 3730(b)(2). Compl., ECF No. 1. That original complaint named as Defendants: Reditus, Tri County, MDX Laboratories, Myriad, Midwest, Aaron, Banno, and Larry Rossi (*i.e.*, Lawrence). *Id.* Relator amended her complaint on December 8, 2022 to include the thirteen Defendants named in the operative complaint. *See* First Am. Compl., ECF No. 10. The Government declined to intervene in the suit. *See* Gov't's

4

Not. Decline Intervention, ECF No. 12.  Relator filed her Second Amended Complaint on June 9,

2023, and brings the following claims:

- Count I: Violation of FCA (against all Defendants), Second Am. Compl. ¶¶ 188–94;

- Count II: Violation of AKS (against all Defendants), *id*. ¶¶ 195–99;

- Count III: Violation of Stark Law (against Aaron, Lawrence, Reditus, Tri County, MDx, Myriad, Midwest, and Banno), *id*. ¶¶ 200–04;

- Count IV: Violation of IFCA (against all Defendants), *id*. ¶¶ 205–11;

- Count V: Violation of IICFPA (against all Defendants), *id*. ¶¶ 212–18;

- Count VI: Retaliation in violation of FCA, IFCA, IICFPA, and IWA (against Aaron, Lawrence, and Reditus), *id*. ¶¶ 219–26;

- Count VII: Violation of EKRA (against all Defendants), *id*. ¶¶ 227–35;

- Count VIII: Breach of Contract (against Tri County only), *id*. ¶¶ 236–41;

- Count IX: Violation of IWPCA (against Aaron, Lawrence, Reditus, and Tri County), *id*. ¶¶ 242–48.[2]

All Defendants move to dismiss Relator's Second Amended Complaint.

## DISCUSSION

## I.    Motions for Leave to File Replies

Eight Defendants move for leave to file replies in support of their motions to dismiss:

Myriad, Zowin, Lawrence, Tri County, Banno, Midwest, Reditus, and MDx.  Relator does not

oppose the motions.  Joint Status Report 3, ECF No. 66.

On a motion to dismiss, "[n]o reply to the response is permitted without leave of Court."

Civil LR 7.1(B)(3) (effective through Sept. 18, 2024).  "Typically, reply briefs are permitted if

the party opposing a motion has introduced new and unexpected issues in his response to the

motion, and the [c]ourt finds that a reply from the moving party would be helpful to its

---

[2] Count IX is incorrectly labeled "Count VIII."  *See* Second Am. Compl. 53.

disposition of the motion." *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011). A court may also permit a reply "in the interest of completeness." *Zhan v. Hogan*, No. 4:18-cv-04126-SLD-JEH, 2018 WL 9877970, at *2 (C.D. Ill. Dec. 18, 2018) (quotation marks omitted). Because the proposed replies would be helpful to the Court and in the interest of completeness, Defendants' motions for leave to file replies are granted. The Clerk is directed to file the proposed replies, ECF Nos. 82-1, 83-1, 84-1, 85-1, 86-1, & 92-1, on the docket.

## II.    Motions to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the motion to dismiss stage, the key inquiry is whether the complaint is "sufficient to provide the defendant with 'fair notice' of the plaintiff's claim and its basis." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). "[D]etailed factual allegations are unnecessary," *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016), but the complaint must contain "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The purpose of a motion to dismiss is to challenge the sufficiency of the complaint, not to decide its merits." *Dutch Valley Growers, Inc. v. Rietveld*, No. 16-2085, 2016 WL 10789393, at *2 (C.D. Ill. Aug. 29, 2016).

When deciding on a motion to dismiss, a court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022). "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim," however, "are not entitled to [the] presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th

Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must contain more than "labels and conclusions" or "naked assertions devoid of further factual enhancement"—in other words, it must go beyond a simple "unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quotation marks and alterations omitted).

Where a claim involves an allegation of fraud or deception, the plaintiff must also satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements.  *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  A plaintiff must "allege specific facts demonstrating what occurred at the individualized transactional level" to maintain a fraud claim.  *Lanahan v. County of Cook*, 41 F.4th 854, 862 (7th Cir. 2022) (quotation marks and alteration omitted).  Those specific facts must include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."  *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (quotation marks omitted).  In other words, the plaintiff must identify the "who, what, when, where, and how of the fraud."  *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (quotation marks omitted).  Rule 9(b) "requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported."  *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (quotation marks omitted).  Importantly, though, "plausibility remains the pleading benchmark, even when

a claim is subject to Rule 9(b)'s particularity requirement." *Hobbs v. Gerber Prods. Co.*, No. 17 CV 3534, 2018 WL 3861571, at *8 (N.D. Ill. Aug. 14, 2018).

### III.    Analysis

#### a.    Counts II, III, VII: AKS, Stark Law, and EKRA

All Defendants argue Relator's AKS, Stark Law, and EKRA claims should be dismissed because those statutes do not provide a private right of action.  Myriad Mem. Supp. Mot. Dismiss 13–14, ECF No. 34; Zowin Mem. Supp. Mot. Dismiss 16–17, ECF No. 47; Lawrence & Tri County Mem. Supp. Mot. Dismiss 2–4, ECF No. 49; Banno & Midwest Mem. Supp. Mot. Dismiss 6, ECF No. 51; Reditus Mem. Supp. Mot. Dismiss 2, ECF No. 64; Aaron Mem. Supp. Mot. Dismiss 2–3, ECF No. 71 at 3–23; MDx Mem. Supp. Mot. Dismiss 15–17, ECF No. 80. Relator concedes this point.  *See, e.g.*, Resp. Myriad 9, ECF No. 74 ("To be clear, Relator is not asserting free-standing causes of action under those statutes.").  Relator instead retools Counts II, III, and VII as theories of FCA liability.  *See, e.g.*, Resp. Reditus 3, ECF No. 75 ("[T]his arrangement violated the AKS, STARK and EKRA, and the claims that resulted from these tainted referrals violated the FCA, which indisputably provides a private cause of action.").

Because the Second Amended Complaint sets forth these claims in individual counts and includes a separate FCA count, it appears that Relator is asserting standalone claims for those violations.  Because Counts II (AKS), III (Stark Law), and VII (EKRA) do not provide a private right of action, those counts are DISMISSED WITH PREJUDICE.  *See United States ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10 C 368, 2014 WL 3583980, at *4 (N.D. Ill. July 18, 2014) ("Neither [the AKS nor the Stark Law] provides a right of private enforcement . . . ."); *Pearson v. DeVries*, No. 3:19-CV-972-NJR, 2020 WL 1915281, at *2 (S.D. Ill. Apr. 20, 2020) ("There is . . . no private right of action under federal criminal statutes."); *United States v. Advoc. Health & Hosps. Corp.*, No. 1:20-cv-01243, 2023 WL 2799699, at *4 (C.D. Ill. Apr. 5, 2023)

8

("[T]o eliminate any confusion, to the extent Relator's Complaint states any claims under the AKS . . . alone, they are dismissed with prejudice.").

    **b.  Counts I, IV, V: Violations of the FCA, IFCA, and IICFPA (against all Defendants)**

    The federal FCA prohibits knowingly presenting, or causing to be presented, false or fraudulent claims for payment to the federal government.  31 U.S.C. § 3729(a)(1)(A).  To sufficiently allege an FCA claim under § 3729(a)(1)(A), a relator "must plead with particularity" (1) the existence of a false or fraudulent claim, (2) the defendant's presentment or submission of the false claim to the government for payment, and (3) the defendant's knowledge that the submitted claim was false.  *Lanahan*, 41 F.4th at 862.  An FCA violation must be committed knowingly, which requires "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  *Id*. § 3729(b)(1)(B).

    The IFCA "closely mirrors the FCA," *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 n.2 (7th Cir. 2017) (quotation marks omitted), and imposes liability on anyone who submits or causes the submission of false claims to the State of Illinois, *United States ex rel. Sibley v. A Plus Physicians Billing Serv., Inc.*, No. 13 C 7733, 2015 WL 8780548, at *3 (N.D. Ill. Dec. 15, 2015); 740 ILCS 175/3(a)(1).  The Seventh Circuit has "not found any difference between the [FCA and IFCA] that is material to a jurisdictional or merits analysis." *Bellevue*, 867 F.3d at 716 n.2; *United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1084 (N.D. Ill. 2019) ("Courts evaluate IFCA claims under the same standards as those applicable to FCA claims.").

The IICFPA imposes civil penalties for fraud against private insurance companies. 740 ILCS 92/1–45. The statute creates a private right of action against anyone who violates any provision of the IICFPA or the Illinois criminal code sections relating to insurance fraud. 740 ILCS 92/5(b); 720 ILCS 5/17-10.5(a)(1) ("A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company . . . by the making of a false claim or by causing a false claim to be made . . . intending to deprive an insurance company . . . permanently of the use and benefit of that property."); *see also State ex rel. Leibowitz v. Fam. Vision Care, LLC*, 181 N.E.3d 790, 792–93 (Ill. 2020).

Defendants assert several grounds for dismissal of Relator's FCA claims: Some argue that the *qui tam* provisions of the FCA are unconstitutional. Some argue that Relator's FCA claims should be dismissed pursuant to the FCA's public disclosure bar. One Defendant argues it was not served properly. All argue that Relator fails to state a claim under Rule 12(b)(6) and fails to plead with particularity as required by Rule 9(b).

Relator arranges her allegations into four broad schemes then lumps them together in one FCA false claim count, one IFCA count, and one IICFPA count. For clarity, the Court assumes that each scheme constitutes a separate claim for relief. *See NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) ("One set of facts producing one injury creates one claim for relief . . . ."); *see also* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count . . . ."). The first scheme involves unlawful referrals, kickbacks, and billing practices by Reditus, Tri County, Lawrence, and Aaron. The second scheme involves kickbacks and referrals among Midwest, Banno, Zowin, and Reditus. The third scheme involves kickbacks and referrals among

MDx, Myriad, Banno, Midwest, Zowin, and Reditus.  The fourth and final scheme involves

Aaron and Reditus's billing software auto-populating false charges and claims for COVID-19

tests.  The Court addresses Defendants' arguments for dismissal of each scheme in turn, starting

with the threshold procedural, constitutional, and jurisdictional arguments.

### i. Failure to Timely Serve MDx

MDx moves to dismiss all claims against it under Federal Rule of Civil Procedure

12(b)(5) for insufficient service of process.  MDx Mem. Supp. Mot. Dismiss 9.  When a

defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proof to

demonstrate good cause for failing to provide timely service.  *Geiger v. Allen*, 850 F.2d 330, 333

(7th Cir. 1988); Fed. R. Civ. P. 4(m) (providing that if a defendant is not timely served and the

plaintiff "shows good cause for the failure, the court must extend the time for service for an

appropriate period").  The determination of whether good cause exists is within the district

court's sound discretion, *Bachenski v. Malnati*, 11 F.3d 1371, 1376 (7th Cir. 1993), but requires

the plaintiff to "provide evidence of reasonable diligence in attempting service," *Plotkin v.*

*UChicago Argonne LLC/Argonne Nat'l Lab'y*, No. 23 C 3035, 2024 WL 3470580, at *3 (N.D.

Ill. July 19, 2024) (quotation marks omitted).

Pursuant to 31 U.S.C. § 3730(b)(2), a *qui tam* relator shall file a complaint alleging FCA

violations under seal and the complaint "shall not be served on the defendant until the court so

orders."  Here, the Court ordered that this action remain under seal until June 22, 2023, and not

be served upon any defendants until after the seal was lifted.  *See* June 9, 2023 Order 1, ECF No.

15 (Hawley, M.J.).  Rule 4(m) sets forth a 90-day deadline for a defendant to be served and

Relator does not dispute that she failed to meet that deadline when she served MDx on

November 20, 2023.  *See* Return of Service: MDx, ECF No. 65; Resp. MDx 4–5, ECF No. 91.

Relator states that she "was diligent in attempting to serve MDx" but that she inadvertently served the wrong company which has a similar name and, like MDx, is located in California.  Resp. MDx 4.  Relator urges the Court not to dismiss MDx because that "would not end the case against it" and "would only delay the case and needlessly increase attorneys' fees and costs for Relator and MDx itself."  *Id.*  Relator states that she "corrected the service issue as promptly as possible" but provides no evidence of reasonable diligence nor does she explain why she did not request an extension of time to effect service under Rule 6(b) after discovering her mistake.  *Id.*  Relator has not met her burden to show good cause for failing to timely serve MDx and an extension of time for proper service is therefore not mandatory under Rule 4(m).

"Even if a plaintiff does not establish good cause, the district court may in its discretion grant an extension of time for service."  *Troxell v. Fedders of N. Am., Inc.*, 160 F.3d 381, 383 (7th Cir. 1998).

> In its assessment, the court may consider a number of factors including, but not limited to, whether the extension would harm the defendant's ability in defending the suit; whether the defendant received actual notice of the suit; whether statute of limitations would bar refiling of the action; whether the defendant evaded service; whether the defendant admitted liability; whether dismissal will result in a windfall to a defendant; whether the plaintiff eventually effected service; whether the plaintiff ever requested an extension from the court due to difficulties in perfecting service; and whether the plaintiff diligently pursued service during the allotted period.

*Plotkin*, 2024 WL 3470580, at *2.  As Relator recognizes, dismissal at this stage does not bar the case against MDx but, contrary to Relator's argument, this factor weighs in favor of dismissal.  MDx did receive actual notice of the suit because Relator eventually effected service, but Relator did not request an extension of time to serve MDx nor has she shown that she diligently pursued service during the allotted period.  Moreover, Relator is represented by an attorney who is surely familiar with the Federal Rules of Civil Procedure governing service of summons and requests for extensions of time.  Where a plaintiff is proceeding *pro se*, courts are more likely to be

sympathetic when procedural rules are not followed perfectly and therefore more likely to deny motions to dismiss under Rule 12(b)(5).  *See, e.g.*, *Campbell v. Swanson*, No. 4:22-cv-04013-SLD-JEH, 2023 WL 2754926, at *7 (C.D. Ill. Mar. 31, 2023) (denying the defendants' Rule 12(b)(5) motion to dismiss because the plaintiff was proceeding *pro se*); *Plotkin*, 2024 WL 3470580, at *4 ("While an attorney is unlikely to be excused for making mistakes of this kind, given that Plaintiff is representing himself, this Court finds Plaintiff's mistake as to the correct service period forgivable.").  The Court finds that the balance of hardships does not weigh in Relator's favor and she has not demonstrated excusable neglect for failing to timely effect service.  Even if the factors did not favor dismissal, the Court would exercise its discretion to hold Relator responsible for her admitted inaction by dismissing the claims against MDx.  *See Jones v. Ramos*, 12 F.4th 745, 749 (7th Cir. 2021) ("Even if the balance of hardships appears to favor an extension, the district court retain[s] its discretion to hold the Plaintiffs accountable for their actions—or, more accurately, inaction—by dismissing the case." (alteration in original) (quotation marks omitted)).  MDx's motion to dismiss all claims against it under Rule 12(b)(5) is GRANTED.

### ii.  Constitutionality of the *Qui Tam* Provisions of the FCA

Four Defendants—Reditus, Banno, Midwest, and Zowin—argue that the *qui tam* provisions of the FCA violate Article II of the Constitution and that Relator lacks Article III standing to bring an FCA action on behalf of the federal government.  Reditus Mem. Supp. Mot. Dismiss 17–18; Banno & Midwest Mem. Supp. Mot. Dismiss 20; Zowin Mem. Supp. Mot. Dismiss 17–19.  In support of their argument, these Defendants rely almost exclusively on Justice Thomas's dissent in *United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023).  These Defendants assert that the FCA violates Article II of the Constitution because only an officer of the United States can "conduct[] civil litigation . . . for

13

vindicating public rights," *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting) (quoting *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam)), and Relator is not an officer of the United States. They argue that Relator lacks Article III standing because the Supreme Court has never identified "the source of Congress' power to effect partial assignments of the United States' damages claims," *Polansky*, 599 U.S. at 451 (Thomas, J., dissenting), which was the Court's rationale for upholding private relator standing in FCA *qui tam* actions in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).

This Court declines to dismiss Relator's FCA claims on the grounds that the FCA's *qui tam* provisions are unconstitutional for three reasons: (1) Defendants cite no binding precedent to support their Article II argument, only a dissent;[3] (2) the Supreme Court has held that a private relator has standing to bring suit under the FCA; and (3) Defendants have not followed the proper procedure for challenging the constitutionality of a federal statute.  The Supreme Court expressly held in *Stevens* that a private person has Article III standing to bring an FCA action on behalf of the federal government, *see* 529 U.S. at 778 ("[There is] no room for doubt that a *qui tam* relator under the FCA has Article III standing."), and in the 24 years since *Stevens* was decided, the Court has declined to overrule its prior holding.  *See, e.g.*, *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 743 (2023) ("The FCA permits private parties to bring lawsuits in the name of the United States—called *qui tam* lawsuits—against those who they believe have defrauded the Federal Government." (citation omitted)); *Polansky*, 599 U.S. at 423 ("The [FCA] is unusual in authorizing private parties—known as relators—to sue on the

---

[3] In *Stevens*, the Supreme Court acknowledged that it was not addressing whether *qui tam* actions violate Article II because that issue was not challenged by the parties and Article II generally does not present a jurisdictional issue. *Stevens*, 529 U.S. at 778 n.8 ("[O]ur standing jurisprudence, . . . though it may sometimes have an impact on Presidential powers, derives from Article III and not Article II." (alteration in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 n.4 (1998))).  This Court declines to take up the issue of Article II standing in this case because Defendants have cited no binding precedent to support their argument that Relator lacks Article II standing.

14

Government's behalf."); *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 26, 29 (2016) ("Almost unique to the FCA are its *qui tam* enforcement provisions, which allow a private party known as a 'relator' to bring an FCA action on behalf of the Government." (citations omitted)).

Moreover, as noted by Relator, there are procedures that a litigant must follow when challenging the constitutionality of a federal statute and these four Defendants have not followed those procedures. As relevant here, 28 U.S.C. § 2403(a) provides that when a litigant challenges the constitutionality of a Congressional act "affecting the public interest" in any federal court action to which the United States or any federal agency, officer, or employee is not a party, "the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality." Additionally, pursuant to Federal Rule of Civil Procedure 5.1, a litigant must:

> (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if: (A) a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity; . . . and (2) serve the notice and paper on the Attorney General of the United States.

As mentioned above, the United States declined to intervene in this action and therefore is not a party to this suit. *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009) ("The United States . . . is a 'party' to a privately filed FCA action only if it intervenes in accordance with the procedures established by federal law."). Because the United States is not a party, § 2403 and Rule 5.1 apply, yet Reditus, Banno, Midwest, and Zowin failed to comply with the procedural requirements. Accordingly, the Court declines to dismiss Relator's FCA claims on the basis that the FCA's *qui tam* provisions are unconstitutional.

### iii.  Public Disclosure Bar

The FCA's public disclosure bar mandates dismissal of FCA claims if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" and the relator is not "an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  The public disclosure bar provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.*  An original source is someone who, prior to public disclosure "has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action."  *Id.* § 3730(e)(4)(B).

Aaron, Banno, Midwest, and Zowin argue that Relator's FCA claims are barred by the FCA's public disclosure bar.  Aaron Mem. Supp. Mot. Dismiss 5–7; Banno & Midwest Mem. Supp. Mot. Dismiss 20; Zowin Mem. Supp. Mot. Dismiss 12–15.

Aaron bases his public disclosure bar argument on a state court lawsuit filed in Tazewell County, Illinois and the publicity surrounding it: *Davie & Associates Dermatopathology, P.A. v. Reditus Healthcare, LLC et al.*, No. 2021-L-000019 (Ill. Cir. Ct. filed Feb. 3, 2021).  Aaron Mem. Supp. Mot. Dismiss 5–7.  Relator responds that the public disclosure bar does not apply

here because it "only applies to suits in 1) federal court and 2) where the [federal] government is a party." Resp. Aaron 4–7, ECF No. 88.

When Congress amended the FCA in 2010, it "withdr[e]w from triggering the public disclosure bar allegations disclosed in state court lawsuits, or federal lawsuits in which the federal government is not a party." *United States ex rel. JDJ & Assocs. LLP v. Natixis*, No. 15-cv-5427 (PKC), 2017 WL 4357797, at *5 (S.D.N.Y. Sept. 29, 2017). Because Aaron relies on disclosures made in a state court suit, those disclosures do not trigger the public disclosure bar.

The question remains though whether the news media surrounding that case may have put "the critical elements exposing the transaction as fraudulent . . . in the public domain." *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 274 (7th Cir. 2016) (quotation marks omitted); *see* 31 U.S.C. § 3730(e)(4)(A)(iii). Aaron cites to one news article to support his argument. *See* Mar. 9, 2023 25News Now Article, Aaron Mem. Supp. Mot. Dismiss Ex. B, ECF No. 71 at 149–51.

Relator responds that "the article cited by Defendants does not contain the information Defendants claim is the basis for the public disclosure," her claims are not "based upon" the allegedly public information, and she is an "original source" within the purview of the FCA. Resp. Aaron 4–5; *see Bellevue*, 867 F.3d at 718. Relator filed her original complaint on June 17, 2022, whereas the news article cited by Aaron was not published until March 9, 2023. Relator's original complaint alleges many of the same facts as were discussed in the news article, and Relator expressly alleged that she provided the "information to the Government prior to filing [her] action." Compl. ¶ 9; *see also* Second Am. Compl. ¶ 13 (same). Based on the timing of the filing of Relator's original complaint and the publishing of the news article cited by Aaron, as well as Relator's allegation that she is an original source of the same information contained

within the news article, the Court finds that the public disclosure bar does not preclude Relator's FCA claims against Aaron.

Zowin, Banno, and Midwest base their public disclosure argument on a state court lawsuit filed in Peoria County, Illinois, *Physician Advantage, Inc. v. Reditus Laboratories, LLC*, No. 2022-LA-0000239 (Ill. Cir. Ct. filed Nov. 22, 2022). Zowin Mem. Supp. Mot. Dismiss 14–15; Banno & Midwest Mem. Supp. Mot. Dismiss 20 ("The Midwest Defendants join in Defendant Zowin's arguments related to the public disclosure bar . . . ."). In that suit, filed November 22, 2022, Zowin disclosed his consulting agreement, including his annual salary of $500,000 and bonus of 3% of Reditus's business. *See* Zowin-Reditus Consulting Agreement §§ 4.01–4.02, Zowin Mem. Supp. Mot. Dismiss Ex. A, ECF No. 47-1 at 7–14. Zowin points out that "[w]hile Relator initially filed this action on June 17, 2022, Relator did not amend her complaint to add Zowin until December 8, 2022, only after that consulting agreement had been published." Zowin Mem. Supp. Mot. Dismiss 14.

Relator responds that the lawsuit itself does not trigger the public disclosure bar because it was filed in state court, and moreover, "Zowin's salary, alone, does not establish, or even imply, fraud on the government." Resp. Zowin 12–13, ECF No. 76. (citing *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir. 2011)). Zowin attempts to save his public disclosure argument by co-opting Aaron's argument based on the *Davie & Associates* lawsuit "and news/media publication surrounding that case." Zowin Reply 9–10, ECF No. 82-1. Zowin states that the *Davie & Associates* case involved the appointment of a receiver for Reditus who managed the defense of the *Physician Advantage* lawsuit and "reported on it in detail in publicly filed Reports (e.g., Receiver's Seventh Report for the period of October 20, 2022, through November 19, 2022, filed on November 21, 2022)." *Id.* Zowin does not provide any of these

"publicly filed" reports nor does he state what specific information was disclosed in those reports that would directly lead to the inference that Zowin knowingly committed fraud.

The Seventh Circuit has held that a complaint's allegations are "publicly disclosed" "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Cause of Action*, 815 F.3d at 274 (quotation marks omitted). "This definition presents two distinct issues: whether the relevant information was placed in the public domain, and, if so, whether it contained the critical elements exposing the transaction as fraudulent." *Id.* (quotation marks omitted). Even if Zowin's consulting agreement with Reditus was disclosed as part of the receiver's reports prior to Relator amending her complaint, Zowin's consulting agreement with Reditus does not—without more—indicate a fraudulent arrangement. *Cf. id.* at 279 ("[T]he public-disclosure bar removes jurisdiction only where one can infer, as a direct and logical consequence of the disclosed information, that the defendant knowingly—as opposed to negligently—submitted a false set of facts to the Government."). Accordingly, Relator's FCA claims against Zowin, Banno, and Midwest are not barred by the public disclosure bar.

### iv.  Failure to State a Claim or Plead with Particularity

All Defendants argue that the FCA, IFCA, and IICFPA claims should be dismissed because Relator fails to state a claim and plead with particularity as required by Rule 9(b). The parties address Relators' fraud claims in terms of four schemes, each based on different factual allegations. The Court addresses whether Relator states claims under the FCA, IFCA, and IICFPA arising out of each scheme, and sub-scheme, in turn.

### 1.  Scheme 1: Improper Relationship of Referrals, Kickbacks, and Billing Among Reditus, Tri County, Lawrence, and Aaron

For the first scheme, Relator alleges that the business of Reditus and Tri County, as orchestrated by Aaron and Lawrence, was built on unlawful referral relationships, kickbacks, and

fraudulent billing practices.  Second Am. Compl. ¶¶ 57–105.  The allegations comprising this first scheme are more easily understood in smaller sections, so the Court divides its analysis into three sub-schemes.

### A. Scheme 1(A): Referral Arrangement Between Reditus and Tri County

Relator alleges that Tri County and Reditus were structured and related in an improper way only to benefit themselves.  For example, all of Tri County's laboratory referrals and revenue came from Reditus and all of Tri County's time and resources were devoted to Reditus. *Id.* ¶¶ 15, 58.  Relator alleges that Aaron and Lawrence—as the owners of Reditus and Tri County—agreed to have Reditus submit claims on behalf of Tri County, collect payment from the government on those claims, and kickback remuneration to Tri County and Lawrence with excessive compensation and reimbursement of expenses.  *Id.* ¶ 59.  Additionally, Reditus rented part of its own building and equipment to Tri County for a substantially reduced fee, *id.* ¶¶ 76–78, and paid virtually all of Tri County's operating expenses including physician salaries and insurance, effectively resulting in Tri County "having a medical practice with almost no expenses," *id.* ¶¶ 72–74.  For example, between January and April 2022, Reditus paid Tri County $471,076 for pathologists' compensation, including a $27,500 bonus payment.  *Id.* ¶ 74.

As another example, Relator alleges that in November 2020, Aaron caused Reditus to pay Lawrence $200,000 in a lump sum kickback payment "to allow Lawrence to share in Reditus' overbilling."  *Id.* ¶ 64.  In February 2021, Reditus purportedly entered into a written agreement with Lawrence and Tri County, agreeing that Reditus would pay Tri County $25,000 per month for Lawrence's services as clinical medical director for Reditus.  *Id.* ¶ 66.  According to Relator, this $25,000 monthly payment raises alarms for a number of reasons.  First, $25,000 per month is an excessive and unreasonable compensation rate for a medical director.  *See id.* ¶ 68(d) ("By way of comparison, Reditus utilized a previous medical director . . . at a cost of approximately

$3,000 per month."). Second, Lawrence did not meet the requirements to serve as a medical director of a laboratory and did not perform the services for which he was being paid. *Id.* ¶¶ 66, 68(a). And third, Lawrence's services as medical director were redundant because Relator herself was already serving as the medical director of Reditus. *Id.* ¶ 68(c).

Reditus asserts that (1) Relator has not stated an AKS violation because she does not allege that Reditus received anything as part of a *quid pro quo* nor that any allegedly false claims resulted from an AKS violation, (2) Relator oversimplifies the Stark Law as a basis for an FCA violation, (3) Relator does not sufficiently plead materiality or scienter. Reditus Mem. Supp. Mot. Dismiss 3–7. Lawrence and Tri County argue that Relator fails to provide specific representative examples of any false or fraudulent claims for payment and therefore cannot link any alleged kickbacks or improper referrals to any actual claim submitted to the government. Lawrence & Tri County Mem. Supp. Mot. Dismiss 9–11. Simply asserting a statutory violation, they argue, without some connection between the violation and an actual claim for payment, does not state a claim of an FCA violation. *Id.* at 10–11. They further argue that Relator does not sufficiently plead the requisite elements of an FCA claim. *Id.* at 11–14. For example, they argue that Relator does not satisfy the falsity element because she does not plead an underlying AKS, EKRA, or Stark Law violation with particularity. *Id.* Aaron echoes the same arguments as Lawrence, Tri County, and Reditus. Aaron Mem. Supp. Mot. Dismiss 13–19.

Relator asserts that she has pled with requisite particularity and that, among other things, the referral and kickback arrangement among Defendants violated the AKS, EKRA, and the Stark Law. *See e.g.*, Resp. Lawrence & Tri County 5–11, ECF No. 73. But she does not provide much clarity on her claims. Relator also argues that "Defendants' claim that Relator has failed to link this remuneration to specific claims that violate the FCA should be rejected – the entire

21

relationship was premised on the exchange of illegal remuneration between the two companies and their principals, Aaron and Lawrence."  Resp. Aaron 13; Resp. Lawrence & Tri County 5.

Based on Relator's allegations, it seems that the allegedly improper "intermingled corporate structure and exclusive referral relationship" between and among Aaron, Lawrence, Reditus, and Tri County, *see* Resp. Lawrence & Tri County 4, can be summarized thus: Lawrence—as president of Reditus—and Reditus referred "lab test cases" to Tri County.  Second Am. Compl. ¶ 15.  Aaron—as founder and CEO of Reditus—caused Reditus to pay Lawrence— as owner and president of Tri County—a bloated salary for services that Lawrence did not actually perform.  *Id.* ¶¶ 64–69.  Aaron and Lawrence—as the owners of Reditus and Tri County—agreed that they would have Reditus submit claims on behalf of Tri County.  *Id.* ¶ 59. Reditus then submitted claims for payment to the government and private payors for the pathology services that were performed by Tri County.  *Id.* ¶¶ 59–60.

After untangling this knotty arrangement, the Court finds that Relator has not alleged a violation of the kickback statutes that would support an FCA claim based on this sub-scheme.

First, to quickly dispense with the allegations that Defendants violated EKRA: Relator has not cited any cases wherein a relator successfully (or even unsuccessfully) alleged an FCA violation premised on an EKRA violation.  Here, Relator lumps EKRA in with the AKS and the Stark Law, but only cites to authority addressing the AKS and Stark Law.  For example, Relator writes that the arrangement among Lawrence, Tri County, Reditus, and Aaron "violated the AKS, STARK and EKRA, and the claims that resulted from these tainted referrals violated the FCA, which indisputably provides a private cause of action," but then *only* cites the statutory provisions of the AKS and Stark Law, not EKRA, and the cases she cites only address the AKS

and Stark Law, not EKRA.  Resp. Lawrence & Tri County 3.  Any argument that an EKRA violation can be the basis for an FCA claim is undeveloped and therefore waived.

Though Relator does cite cases showing that a Stark Law violation can be the basis for a FCA claim, she nearly entirely fails to develop an argument that Defendants violated the Stark Law.  *See*, *e.g.,* Resp. Reditus 5 (arguing in a conclusory fashion that "myriad payments to the Rossi's [sic] fit well within th[e] expansive definition[]" of a prohibited financial relationship under the Stark Law).  The Stark Law prohibits physicians from referring Medicare or Medicaid patients to receive certain designated health services from healthcare entities with which the physicians (or an immediate family member) have a financial relationship.  42 U.S.C. § 1395nn(a)(1).  It also prohibits a healthcare entity from filing claims with Medicare (or billing another individual, entity, or third-party payor) for any improperly referred designated health services.  *Id.*  As the only physician involved in this sub-scheme, presumably only Lawrence could violate the Stark Law.  But Relator makes no effort to show with any specificity how her allegations demonstrate that Lawrence violated the Stark Law.  For example, she does not even explain whether the services at issue in this case are covered as health services.   The Court will not do her research and construct the argument for her.  *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("It is not th[e] court's responsibility to research and construct the parties' arguments.").

The Court moves on to address whether Relator has alleged a violation of the AKS that could support an FCA claim.  The AKS is a federal criminal statute which proscribes a payee (or payor) (1) knowingly and willfully (2) receiving (or offering) remuneration (3) in exchange for referring individuals (or inducing the referral of individuals) for federally-reimbursed items or services.  42 U.S.C. § 1320a-7b(b)(1)(A), (b)(2)(A).  Remuneration includes "anything of value"

including "rebates, payments disguised as rent or consulting fees, facility time, or waived insurance deductibles." *United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1113 (N.D. Ill. 2018) (quotation marks omitted).

"[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g). "The phrase 'resulting from' requires that there be some causal nexus between the allegedly false claims and the underlying kickback violation. . . . This means that, at a minimum, every claim that forms the basis of FCA liability must be false *by virtue of* the fact that the claims are for services that were referred in violation of the [AKS]." *Stop Ill. Health Care Fraud, LLC v. Sayeed*, 100 F.4th 899, 908 (7th Cir. 2024) ("*Sayeed II*").  A claim submitted in violation of the AKS is also considered to be false for purposes of the IFCA and IICFPA.  *See Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 748–49 (7th Cir. 2020) (recognizing that the same is true of the IFCA (citing *New York v. Amgen Inc.*, 652 F.3d 103, 113 (1st Cir. 2011))); *United States ex rel. Litwiller v. Omnicare, Inc.*, No. 11-cv-8980, 2014 WL 1458443, at *9 n.7 (N.D. Ill. Apr. 14, 2014) (finding that the IICFPA "contain[s] the same elements as the AKS, including unlawful remuneration").

Where an FCA claim is premised on a violation of the AKS, the underlying AKS violation must be pled with particularity as required by Rule 9(b).  *Dolan*, 2014 WL 3583980, at *4.  Additionally, "[w]here a relator's FCA claim depends on violations of the [AKS], the relator must identify a link between the alleged kickback and a claim for government payment." *United States ex rel. Suarez v. AbbVie, Inc.,* No. 15 C 8928, 2019 WL 4749967, at *10 (N.D. Ill. Sept. 30, 2019).

24

The gist of Relator's allegations is that Tri County *received* both the *quid* (referrals) and the *quo* (payment of expenses and physician salaries), and Reditus *paid* both the *quid* (referrals) and the *quo* (payment of expenses and physician salaries). But the AKS requires a *quid pro quo*—in this case, remuneration for referrals or vice versa. Recognizing this, Relator argues that Lawrence "both *paid* and *received* compensation for referrals," Resp. Lawrence & Tri County 5 (emphasis added), and that Lawrence "received facially excessive payments from both companies for fake positions he did not in actuality hold," *id.* at 4. But this vague statement putting Lawrence on both sides of the relationship does not suffice to save Relator's claim. The only referrals alleged in the scheme are *from* Reditus. Relator has not included any particular allegations about Lawrence's role in either company that would show that he, in his role at Reditus, received compensation in exchange for referring persons to Tri County. Relator's argument that Tri County and Reditus "were so intermingled by operational and familial ties that a payment to one enriched the other and *vice versa*," *id.*, is similarly conclusory and unhelpful. She still only alleges that Reditus made the referrals and made the payments. *See* Reditus Reply, ECF No. 85-1. Moreover, while she argues that Aaron "facilitated compensation" to Lawrence, *see* Resp. Aaron 13, she does not allege that Aaron received any referrals or benefits in exchange.

In sum, these allegations do not support an AKS violation and Relator provides no other allegations that would satisfy the falsity element of an FCA, IFCA, or IICFPA claim. Accordingly, the FCA, IFCA, and IICFPA claims based on the allegations of this first sub-scheme are DISMISSED.

### B. Scheme 1(B): Submission of Claims for Services Performed by Noncredentialed Physicians

As part of this second sub-scheme, Relator alleges that Reditus submitted many claims under the names of credentialed Tri County pathologists—including Relator herself—when the work had actually been performed by noncredentialed physicians. Second Am. Compl. ¶¶ 79–87. Relator gives five representative examples of claims that Reditus submitted to Medicare and private insurers, including specific dates, test types, patient initials, and payors. *Id.* ¶¶ 83–87.

Reditus argues that Relator has failed to allege the requisite elements of an FCA claim, namely:

> (a) falsity—*i.e.*, that claims for services performed by non-credentialed physicians could not properly be submitted in the name of a credentialed physician from the same practice group; (b) materiality—*i.e.*, that credentialing status mattered to the government's payment decision; (c) causation—*i.e.*, that the claims would not have been paid but for having a credentialed physician submit the claim; and (d) scienter—*i.e.*, that Reditus knew the claims were false at the time they were submitted.

Reditus Mem. Supp. Mot. Dismiss 7. Lawrence argues that Relator has not plausibly alleged that he caused the submission of any false claims because "[t]his requires some affirmative participation or action by [the defendant] that furthers the unlawful objective." Lawrence & Tri County Mem. Supp. Mot. Dismiss 15 (alteration in original) (quoting *United States ex rel. Lisitza v. Par Pharm. Cos.*, No. 06 C 06131, 2013 WL 870623, at *4 (N.D. Ill. Mar. 7, 2013)). Tri County argues that Relator does not explain how Tri County caused the submission of any allegedly false claims since the claims were submitted by Reditus. *Id.* Aaron adopts Lawrence's same argument. Aaron Mem. Supp. Mot. Dismiss 19.

The Court finds Relator's response lacking on the falsity question, requiring dismissal of any claim based on this scheme. There are various ways a claim can be false and Relator fails to clarify her theory—she simply declares that "[t]hese claims were obviously false." Resp. Reditus 10. "[T]he archetypical [FCA] claim is one in which a 'claim for payment is itself literally false and fraudulent.'" *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732,

740 (7th Cir. 2021) (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1170 (9th Cir. 2006)). Courts have described this as factual falsity and noted that it occurs "when the claimant misrepresents what goods or services . . . it provided." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). Relator's theory is that Tri County and Reditus misrepresented which physician conducted certain services, not that it misrepresented what services were provided. So it is unclear whether this type of misrepresentation qualifies as a factually false statement. *Cf. United States ex rel. Montenegro v. Roseland Cmty. Hosp. Assoc.*, No. 21 CV 2544, 2023 WL 8190136, at *5 (N.D. Ill. Nov. 27, 2023) (characterizing an allegation that the defendants billed for services that were never performed as an allegation of factual falsity). Even if it does, Relator does not provide any coherent argument why the mere fact that a different physician conducted the services would be material to the government's decision to pay a claim (absent some regulatory violation, as described below). Her argument is once again a mere conclusion—"[s]ystematically misrepresenting that a service was provided by someone who had nothing to do with the claim is patently false and material." Resp. Reditus 10.

If instead, Relator is arguing that listing the name of a credentialed physician on a claim where a noncredentialed physician conducted the service violates a regulation such that Reditus and Tri County either expressly or by omission falsely certified that the claims submitted complied with all regulations, *Universal Health Servs. Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186–88 (2016), she has not identified which regulation this practice allegedly violated.

That Relator does not show falsity obviates the need to decide Lawrence, Aaron, and Tri County's arguments about their involvement in submitting any claims. Because Relator does not

sufficiently allege an FCA violation, her IFCA and IICFPA violation claims also fail.  Any FCA,

IFCA, and IICFPA claims based on the allegations of this second sub-scheme are DISMISSED.

### C. Scheme 1(C): Overbilling / Using Improper Diagnostic Code

For this third sub-scheme, Relator alleges that Reditus and Tri County—through Aaron

and Lawrence—routinely overbilled for testing by adding diagnostic codes which can only be

used where a pathologist performs certain functions to claims when no work was conducted by a

licensed pathologist.  Second Am. Compl. ¶¶ 88–103.  For example, Aaron and Lawrence

submitted false claims for payment under CPT Code 88363 for COVID-19 and other clinical

tests including nail, wound, and urine PCRs.  *Id.* ¶ 88.[4]  Relator states that "CPT Code 88363 can

only be used where a pathologist examines and selects archived or previously diagnosed tissue

for molecular analysis," but that clinical tests and COVID-19 tests are performed by lab

technicians, not pathologists, "and thus all bills Reditus submitted for [COVID-19] tests under

CPT Code 88363 are fraudulent."  *Id.* ¶¶ 89–90.  In September 2021, Relator discovered that

Reditus was falsely billing CPT Code 88363 under her name and billing ID when she happened

to see a letter addressed to her from a private insurance company requesting justification for the

use of CPT Code 88363 for a COVID-19 test.  *Id.* ¶ 92.  At that point, she conferred with Reditus

billing employees and Reditus's Chief Financial Officer ("CFO"), and she told both Lawrence

and Aaron that this billing practice was fraudulent and inappropriate.  *Id.* ¶¶ 94–95.  She alleges

that Aaron stopped submitting CPT Code 88363 for COVID-19 tests in late November 2021.  *Id.*

¶ 95.  In March 2022, Relator "became aware that Reditus and Tri[]County began adding charges

---

[4] "CPT" stands for "Current Procedural Terminology."  *See* Off. Inspector Gen., *Special Fraud Alert: Laboratory Payments to Referring Physicians* 3 n.9, Dep't Health & Hum. Servs. (June 25, 2014), https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_06252014.pdf.  "CPT is developed by the [American Medical Association] as a listing of descriptive terms and five character identifying codes and modifiers for reporting medical services and procedures."  *Id.*

under CPT Code G0452 . . . to other clinical tests including nail, wound and urine PCR tests." *Id.* ¶ 97.  Relator alleges that this code was inappropriate because, like CPT Code 88363, it is only applicable if a pathologist performs services in connection with the test.  *Id.*

Relator properly alleges FCA and IICFPA violations by Reditus and Aaron because she pleads (1) the existence of overbilled fraudulent claims which were (2) submitted by Reditus (as illustrated by specific representative examples) to the federal government and private insurers (3) that Reditus knew or were recklessly disregarding whether the claims were false because Relator herself (as well as other Reditus employees) informed both Lawrence and Aaron of the impropriety of their actions.  *See* 31 U.S.C. § 3729(a)(1)(A); *Lanahan*, 41 F.4th at 862; *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 659 (7th Cir. 2022) ("[S]pecific representative examples of fraudulent claims are required to defeat dismissal.").  Such a misrepresentation is also plausibly material—the payor would determine the amount of payment based on the code used.  Relator plausibly alleges both Reditus and Aaron's involvement—the claims were submitted by Reditus and the allegations show that Aaron was responsible for submitting these claims.  *See, e.g.*, Second Am. Compl. ¶ 95 (alleging that Aaron said he "would continue to bill for clinical tests under CPT Code 88363" and that he was the one who deleted the "code from Covid tests for claims for payments submitted thereafter").  Relator gives five representative examples of overbilled claims that Reditus submitted, including specific dates, test types, diagnostic codes, patient initials, and federal government and private payors, though it is worth noting that there is no allegation that any of these identified claims arose out of a COVID-19 test.  *Id.* ¶¶ 99–103.

Reditus and Aaron argue that Relator's allegations that once she opposed this billing practice, Aaron stopped using it and that Aaron relied on his consultants' representations that the

29

billing was permissible "require the dismissal of" her claim.  Reditus Mem. Supp. Mot. Dismiss 8 (citing Second Am. Compl. ¶ 95); Aaron Mem. Supp. Mot. Dismiss 20–21.  They point to case law stating that mistakes, negligence, and flawed reasoning are insufficient to infer fraud.  *See Berkowitz*, 896 F.3d at 842; *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).  They argue that because Aaron was relying on his consultants' indications that the billing practice was permissible, he clearly did not know the practice was unlawful.  But the Court finds that the allegations suggest that Aaron and Reditus acted with reckless disregard to the truth or falsity of claims submitted with a code for pathologist services at least beginning in September 2021.  Relator alleges that she and Reditus's CFO both told Aaron that the billing practice was inappropriate and fraudulent.  *See* Second Am. Compl. ¶¶ 92–95.  Aaron's insistence on relying on unspecified consultants in the face of multiple people telling him the practice was impermissible could show a reckless disregard to whether the practice was permissible.

Accordingly, Relator has at least stated an FCA and IICFPA claim arising out of this third sub-scheme against Reditus and Aaron.  Moreover, even in the absence of a specific representative claim submitted to the State of Illinois based on this scheme, the Court finds that it is proper to infer that Reditus submitted claims for payment to the State of Illinois as well based on the following specific allegations: Reditus contracted with the State of Illinois to provide COVID-19 testing, *id.* ¶ 159; the contract was in place at the time that Reditus and Aaron are alleged to have had knowledge of the falsity of their claims, *see id.* ¶ 160 (alleging that the contracts ended in March 2022); Reditus submitted at least one claim for payment for a COVID-19 test to the state of Illinois on June 8, 2021, *id.* ¶ 164; and the improper CPT Code 88363 was routinely added to COVID-19 tests, *id.* ¶ 95.  These allegations specifically lead to the

conclusion that a claim for a COVID-19 test with CPT Code 88363 was submitted to the State of Illinois. *See United States ex rel. Mamalakis*, 20 F.4th 295, 301 (7th Cir. 2021) (noting that "including particularized factual allegations that give rise to a plausible inference of fraud" can suffice under Rule 9(b)). Accordingly, Relator has plausibly stated a claim for an IFCA violation as well.

However, Relator fails to sufficiently allege that Lawrence and Tri County "had an active role in submitting" these false claims to the government. *United States, ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 802 (N.D. Ill. 2018); *see* Lawrence & Tri County Mem. Supp. Mot. Dismiss 16 (arguing that Relator "does not provide any details explaining how Tri County was allegedly involved in Reditus' alleged use of CTP [sic] code 88363 for Covid tests" and that Relator only alleges that Lawrence was aware of the fraud); *id.* at 18 (arguing that Relator fails to provide any details about Tri County's submission of false claims under code G0452 and that there is no allegation that Lawrence was involved). Relator responds that Tri County's role was providing pathology services and noting that a letter about billing was directed to Relator and that Lawrence attempted to conceal it. Resp. Lawrence & Tri County 14–15. Relator does not assert that Tri County itself submitted claims, *id.*, despite her allegations to that effect, *see*, *e.g.*, Second Am. Compl. ¶ 102 (alleging that "Reditus and Tri[]County submitted claims for payment to Medicare under CPT Codes 88363 and G0452 for patient A.H."), which makes sense given her other allegation that Reditus took care of all billing, *see id.* ¶ 59 (alleging that Aaron and Lawrence "agreed that they would have Reditus submit claims on behalf of Tri[]County"). Relator certainly implies that Lawrence and Tri County would have been involved in submitting claims considering that the claims were made in Tri County pathologists' names, but she does not allege any specifics sufficient to meet her burden under Rule 9(b) to

31

allege that Lawrence and Tri County can be found liable for causing these false claims to be submitted.  She could have included details about the billing process which would have shed light on what specific role they had in Reditus's billing, but she did not.

In sum, any FCA, IFCA, and IICFPA claims arising out of this third sub-scheme survive against Reditus and Aaron but are DISMISSED against Lawrence and Tri County.

### 2. Scheme 2: Kickbacks and Referrals Among Midwest, Banno, Zowin, Tri County, and Reditus

For the second scheme, Relator alleges that Zowin brokered an arrangement whereby Banno and Midwest received kickbacks in exchange for referring laboratory testing cases to Reditus/Tri County, which Reditus then billed to the government and private insurers.  Second Am. Compl. ¶¶ 106–34.  For Zowin's role in this scheme, Reditus "structured Zowin's compensation to motivate him to engage in illegal conduct" and paid him a salary of $500,000 per year plus a bonus of three percent of Reditus's business which was "far in excess of fair market value for his so-called consulting services."  *Id.* ¶ 127.  Zowin arranged a contract between Banno and Reditus for UTI testing for which "Reditus w[ould] bill Medicare and Public aid directly."  *Id.* ¶ 118 (quotation marks omitted).

Relator alleges that referrals from Banno comprised about eighty percent of Reditus's urology laboratory services revenue.  *Id.* ¶ 107.  Banno and Midwest "referred hundreds of cases to Reditus, including urological laboratory referrals, such as prostate biopsies, urine, blood testing samples, etc."  *Id.* ¶ 113.  In exchange for those referrals, Reditus provided kickbacks to Banno and Midwest in the forms of: (1) direct payments to Banno of $15,000 on a quarterly basis; (2) the covering of excessive and unnecessary expenses, such as first-class airfare and a stay at a lavish $1,000 per night hotel for Banno to attend a conference in May 2022; (3)

32

discounted COVID-19 tests; (4) a joint business venture between Banno and Aaron to expand

Banno's own laboratory business using Reditus's facility. *Id.* ¶¶ 114–29.

According to Relator, the $15,000 quarterly payments from Reditus to Banno were

disguised on invoices as "consulting fees." *Id.* ¶¶ 114–18. To conceal the $15,000 kickback

payments, Zowin instructed his wife (*i.e.*, Banno's niece and Midwest's billing staff member) on

what to say on the consulting invoices "to make it look like Banno was billing by the hour for his

work." *Id.* ¶ 120. Relator gives a specific example where she saw one of these invoices

itemizing Banno's time spent purportedly consulting with Relator herself. *Id.* ¶ 121. Relator

knew that invoice was false because she never consulted with Banno. *Id.*

The kickback payments to Banno started on July 6, 2021, and the number of referrals

from Banno and Midwest to Reditus and Tri County increased exponentially after that date. *Id.*

¶ 119 (showing that before July 6, 2021, Midwest had referred a total of 27 cases to Reditus, and

after July 6, 2021, Midwest had referred a total of 1,293 cases, resulting in an overall 4,689%

increase in referrals). As a further kickback, Reditus provided substantially discounted or free

COVID-19 tests to Midwest. *Id.* ¶ 123–24 (stating that before the referrals started, Reditus

charged Midwest $100 per test, but after the referrals started, Reditus only charged Midwest $40

per test). On February 17, 2022, Banno emailed Aaron stating that they ran a risk of violating

the AKS if there was "any suggestion that Reditus [was] charging a below-market rate" because

that "could suggest that Reditus intended to induce Midwest to provide referrals." *Id.*

Banno and Midwest argue that Relator does not sufficiently plead (1) falsity via

violations of the AKS, EKRA, or the Stark Law, (2) that Banno and Midwest submitted or

caused the submission of any false claim, and (3) that Banno and Midwest acted knowingly

under the FCA. Banno & Midwest Mem. Supp. Mot. Dismiss 6–19. Reditus argues that Relator

33

fails to plead that Reditus knowingly paid any remuneration to Banno, Zowin, or Midwest. Reditus Mem. Supp. Mot. Dismiss 8–11. Zowin argues that Relator does not allege that he submitted or caused the submission of any false claims, nor does she plead her FCA claims with the requisite particularity. Zowin Mem. Supp. Mot. Dismiss 7–12, 15–16.

As stated above, to show a violation of the AKS, a relator must allege that a defendant: (1) knowingly and willfully (2) paid or received remuneration (3) in exchange for referrals for any federally-reimbursed items or services. 42 U.S.C. § 1320a-7b(b)(1)–(2). "The idea is that health care providers should help patients make decisions in the best interests of health, not based on the provider's pocketbook." *United States ex rel. Gill v. CVS Health Corp.*, No. 18-cv-6494, 2024 WL 3950211, at *20 (N.D. Ill. Aug. 26, 2024). A claim submitted for payment to the government resulting from a violation of the AKS is *per se* false for purposes of the FCA pursuant to 42 U.S.C. § 1320a-7b(g).

Midwest and Banno argue that Relator fails to allege the existence of prohibited remuneration. Banno & Midwest Mem. Supp. Mot. Dismiss 7. Relator points to the $15,000 quarterly payments made to Banno and Midwest that were disguised as consulting fees. Resp. Banno & Midwest 5–6, ECF No. 72. Midwest and Banno's arguments that this does not suffice miss the mark. For example, they argue that Relator does not identify the fair market value of the alleged consulting services and that she does not specifically allege when payments were made or that payments were made in order to induce referrals. *See* Banno & Midwest Mem. Supp. Mot. Dismiss 8. But Relator is not alleging that the payments exceeded fair market value; instead, she is alleging that *no* consulting work was completed, so there is no fair market value for the payment. Resp. Banno & Midwest 7. Banno and Midwest also argue that Relator does not sufficiently allege the existence of the $15,000 quarterly kickbacks, Banno & Midwest Mem.

34

Supp. 8, but they are asking for too much. Relator alleges that $15,000 payments were made on four specific dates by Reditus and that they were made out to Banno personally at Banno's direction. Second Am. Compl. ¶¶ 114–115, 117. It is unclear what further detail would be required.

Banno and Midwest also argue that Relator fails to plead facts sufficient to allege that the $15,000 payments were intended to be or were received as remuneration in exchange for referrals. Banno & Midwest Mem. Supp. Mot. Dismiss 10–12. But Relator points to evidence which shows that the number of referrals made by Banno and Midwest for tests billed with two particular types of tests increased significantly after the first payment of $15,000 was made. *See* Second Am. Compl. ¶ 119. She also points to five representative examples of patients who were referred to Reditus by Banno and Midwest. *See id.* ¶ 132. Moreover, the circumstances of the arrangement, at least as alleged, contribute to an inference that the $15,000 payment was made in order to receive referrals from Banno and was received by Banno with the understanding that he should increase his referrals to Reditus. *See United States ex rel. Young v. Suburban Homes Physicians*, No. 14-cv-02793, 2017 WL 6625940, at *3 (N.D. Ill. Dec. 28, 2017) (suggesting that "[a] facially legitimate exchange may constitute unlawful remuneration if the surrounding circumstances support the inference that the exchange was intended as an illicit inducement" like where "the value conferred on a party to the exchange far exceeds what would be commercially reasonable"). Here, Relator alleges that the $15,000 payment was made with no expectation that Banno would complete any work, Zowin told Banno's billing employee (who was also Zowin's wife) to disguise invoices to make it look like Banno was billing for consulting work, and one of the invoices charged for hours consulting with Relator, which never occurred. Second Am. Compl. ¶¶ 116– 21. Assuming these facts are true, the $15,000 payments qualify as

remuneration, and they were received in exchange for increasing referrals to Reditus.  Because there is at least one form of remuneration, the Court finds it unnecessary to address the other alleged forms of remuneration.

Next, Banno and Midwest argue that Relator fails to plead that they "knowingly and willfully" received the $15,000 in exchange for referrals.  Banno & Midwest Mem. Supp. Mot. Dismiss 12.  Reditus makes a similar argument that Relator fails to plead that it acted knowingly within the meaning of the AKS.  *See* Reditus Mem. Supp. Mot. Dismiss 10–11.  "Courts in the Seventh Circuit have interpreted 'knowingly and willfully' in [the AKS] context to mean that defendant 'intended to engage in conduct that he knew was wrongful.'"  *Suarez*, 2019 WL 4749967, at *13 (quoting *United States v. Patel*, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014), *aff'd*, 778 F.3d 607 (7th Cir. 2015)); *see also United States v. Wheeler*, 540 F.3d 683, 690 (7th Cir. 2008) (addressing the definition of "knowingly and willfully" in the context of a federal healthcare theft statute and noting that, "in general, 'willfully' means more than acting intentionally when it is used conjunctively with 'knowingly'"); *United States v. Ill. Cent. R.R. Co.*, 303 U.S. 239, 243 (1938) ("'Willfully' means something not expressed by 'knowingly,' else both would not be used conjunctively." (quotation marks omitted)).

An email from Banno to Aaron, on behalf of Reditus, demonstrates that both parties were aware that offering kickbacks to induce referrals would violate the AKS.  *See* Second Am. Compl. ¶ 125.  Banno and Midwest argue that the Court "cannot reasonably infer scienter" from the email because it relates to a proposed business venture and "there are no allegations . . . Banno carried out the arrangement."  Banno & Midwest Mem. Supp. Mot. Dismiss 12.  In support, they cite *Suarez* for the proposition that a court will not infer scienter from allegations about a different form of remuneration.  *Id.* (citing *Suarez*, 2019 WL 4749967, at *13–14).  But

in *Suarez*, the court concluded that it would not draw an inference that the defendant acted willfully and knowingly under the AKS based on allegations that it covered up "the true nature" of a program "because it [wa]s unclear whether the alleged cover-up efforts ha[d] any relation to the services alleged to constitute illegal remunerations in this case." *Suarez*, 2019 WL 4749967, at *14. The allegation here is far more direct than saying that Midwest and Banno tried to cover up their wrongdoing—the allegation shows that Banno and Aaron were aware that offering kickbacks to induce referrals was illegal. The Court fails to see why the fact that the email relates to a different potential venture means it cannot rely on that to infer knowledge of wrongdoing here (the email also post-dates the kickbacks, but no one raises that argument). Moreover, the circumstances of the payments similarly indicate that Banno, Midwest, and Reditus knew they were engaging in wrongdoing. For example, the payments were allegedly made in exchange for no work and the invoices contained fictitious entries for consulting.

Banno and Midwest next argue that Relator fails to allege that any claims included items or services resulting from an AKS violation. Banno & Midwest Mem. Supp. 15–16. They rely on out-of-circuit authority holding that Relator must show but-for causation, meaning that Reditus would not have made claims for certain services but for the illegal kickback to Banno. *See id.* But the Seventh Circuit has not decided what the causal standard is for AKS-based FCA claims. *See Sayeed II*, 100 F.4th at 908–09. And the allegations are sufficient to show that any claims submitted seek reimbursement for services provided in violation of the AKS. *See id.* at 909. The Court declines to dismiss these claims based on an unanswered question of law, particularly where, as here, Banno and Midwest's argument on this point is one paragraph long.

The last issue to decide is whether Relator has sufficiently alleged that claims including services provided in violation of the AKS were submitted to Medicare, the State of Illinois, and

private payors, and, if so, who she plausibly alleges participated in submission of those claims.[5]

Relator provides five representative examples of claims that Reditus submitted to Medicare and

private insurers, including specific dates, patient initials, and payors. *Id.* ¶¶ 132(a)–(e). Relator

does not allege a specific claim submitted to the State of Illinois, but Relator notes that she was a

pathologist, not in control of any relevant entity's billing. Resp. Banno & Midwest 8. Courts

have been willing to relax Rule 9(b)'s requirements where a relator is unable to corroborate a

claim because of her lack of access. Here, given the allegations that claims were submitted to

Medicare and private insurers, it is plausible that claims were submitted to the State too. *Cf.*

*United States v. Omnicare, Inc.*, No. 07 C 5777, 2011 WL 1059148, at *5 (N.D. Ill. Mar. 21,

2011) (denying motion to dismiss IICFPA claim because it was plausible to infer that the

defendants submitted claims to private insurers because the relator had properly alleged

submission of claims to federal and state programs).

Reditus does not argue that Relator fails to allege that it submitted claims arising out of

its relationship with Midwest and Banno, *see* Reditus Mem. Supp. Mot. Dismiss 8–11, but

Banno and Midwest argue that Relator fails to sufficiently allege that they caused to be presented

false claims arising out of the kickback relationship, Banno & Midwest Mem. Supp. Mot.

Dismiss 16–18. Showing that a defendant caused false claims to be presented "requires some

affirmative participation or action . . . that furthers the unlawful objective." *Lisitza*, 2013 WL

870623, at *4. As explained above, Relator plausibly alleges that Midwest and Banno

participated in the kickback scheme. Thus, the Court finds that Relator has adequately alleged

that Banno, Midwest, and Reditus knowingly submitted or caused to be submitted false claims to

---

[5] They also argue that Relator fails to plead the necessary elements of an implied certification theory, Banno & Midwest Mem. Supp. Mot. Dismiss 13–14, but a claim arising out of a violation of the AKS is *per se* false and courts have, accordingly, held that "certification simply is not an element when proceeding under an AKS theory of liability," *United States v. Vora*, 488 F. Supp. 3d 554, 566 (W.D. Ky. Sept. 22, 2020).

the federal and state government and private payors in violation of the FCA, IFCA, and IICFPA.[6]

In contrast, Relator does not properly allege facts to support the notion that Zowin submitted or caused the submission of any false claims.  She makes the broad claim that Zowin brokered the referral arrangement between Reditus and Banno/Midwest but does not link Zowin's actions to any particular false claims with any specificity.  Absent more details, the Court could not find that Zowin affirmatively participated in the scheme leading to submission of any false claims.  Nor does she allege an AKS violation by Zowin himself because, even if his salary and commission constituted remuneration, Zowin made no referrals in exchange for that compensation.  Accordingly, Relator's FCA, IFCA, and IICFPA claims against Zowin based on these allegations are DISMISSED.

Lawrence, Tri County, and Aaron also argue that Relator fails to sufficiently plead that they can be liable under the FCA for this scheme.  *See* Aaron Mem. Supp. Mot. Dismiss 12–13; Lawrence & Tri County Mem. Supp. Mot. Dismiss 7–8.  In response, Relator essentially just points to the fact that Lawrence was the president of Reditus, that Aaron was the CEO of Reditus, and "Tri-County and Reditus were so intertwined that they were virtually indistinguishable as separate entities."  *See* Resp. Lawrence & Tri County 17; Resp. Aaron 11. These allegations are not sufficient to state a claim against Aaron, Tri County, and Reditus with respect to this scheme because they do not show with any specificity what each of these entities

---

[6] Banno and Midwest also argue that Relator lacks standing to sue them for a violation of the IICFPA because she is not an "interested person" under the statute.  Banno & Midwest Mem. Supp. Mot. Dismiss 19.  The only argument they make is that because she does not allege that she worked for them, she "cannot plausibly know of '*undisclosed* information of wrongdoing' against" Banno and Midwest.  *Id.* (quoting *Leibowitz*, 181 N.E.3d at 799).  *Leibowitz* does not limit interested persons under the IICFPA to employees, so this argument is rejected.  Banno and Midwest make a distinct argument in their reply as to why Relator lacks standing, but the Court declines to consider an argument raised for the first time in a reply.  *Peterson v. Village of Downers Grove*, 103 F. Supp. 3d 918, 925 (N.D. Ill. 2015).

did to commit or participate in the AKS violation or submission of any false claims.  Relator's

FCA, IFCA, and IICFPA claims against Lawrence, Tri County, and Aaron based on these

allegations are DISMISSED.

### 3. Scheme 3: Kickbacks and Referrals Among Myriad, Banno, Zowin, and Reditus[7]

In the third scheme, Relator alleges that Zowin orchestrated an arrangement whereby

Banno would order molecular testing, Reditus would refer the specimens to Myriad, Myriad

would pay Reditus a $70 "case fee" per referral as a kickback, and Reditus would bill Medicare

and private insurance companies $70.11 using CPT Code 88363 "which is a billing code to

examine and select archived, or previously diagnosed, tissue for molecular analysis, which . . .

never occurred in any event at Reditus."  *Id.* ¶¶ 135–51.  According to Relator, Banno, Reditus,

and Myriad were financially incentivized to over-utilize the molecular tests because: (1) Banno

had an interest in Reditus increasing revenue because he was paid quarterly kickbacks from

Reditus and because his niece's husband Zowin was paid on commission by Reditus; (2) Reditus

benefited by earning $70 per test "for doing virtually no work" except referring the tissue

specimens; and (3) Myriad benefited by receiving tissue specimens to perform lucrative

molecular testing which they then billed to the government and private payors.  *Id.* ¶¶ 140–44.

Relator alleges no additional facts regarding Zowin's role in this scheme that were not

already addressed in the second scheme above.  Accordingly, any FCA, IFCA, or IICFPA claims

against Zowin based on the allegations of the third scheme are DISMISSED.

Myriad argues Relator fails to state an FCA claim because, among other things, she does

not allege scienter, even at the generalized level permitted by Rule 9(b), nor does she allege that

---

[7] Relator implicates MDx in this third scheme, alleging that MDx violated the AKS in the same manner as Myriad. Because the Court already dismissed all claims against MDx pursuant to Rule 12(b)(5), *see supra* § III.b.i., the Court does not address Relator's allegations against MDx in this section.

Myriad itself submitted any claims for payment (much less *false* claims).  Myriad Mem. Supp.

Mot. Dismiss 11–13; Myriad Reply 9–12, ECF No. 86-1.  Myriad also asserts that Relator fails

to show a link between the $70 kickback payment and a claim for government payment because

"the entity that Myriad allegedly paid, Reditus, is not the ordering provider of" the laboratory

tests.  Myriad Mem. Supp. Mot. Dismiss 9 (emphasis omitted).

      Relator argues that because the arrangement between Myriad, Banno, Midwest, and

Reditus was so obviously illegal, Myriad must have known of its illegality.  Resp. Myriad 8–9

("Here, the [Second Amended Complaint] alleges that Myriad paid Reditus $70 in order to

induce Banno to order testing from Myriad, and that Reditus provided no services in exchange

for that payment.  Such allegations support a plausible inference that *Myriad acted knowingly*,

*given that the arrangement alleged is plainly illegal*." (emphasis added).  Relator also argues that

the fact that Myriad paid the $70 to Reditus instead of to Banno directly is legally irrelevant

because Banno benefited indirectly which is prohibited under the AKS.  *See id.* at 5–7.

      Relator is correct in stating that the fact that Myriad paid alleged remuneration to Reditus

rather than to Banno himself does not—by itself—absolve the payors of AKS liability.  *See, e.g.*,

*id.* at 5–6 ("A kickback consists of something of value which is provided, directly or indirectly,

to a recipient for an improper purpose.  [And] if there is a sufficiently close relationship between

a third party receiving payments and the person whose influence is sought, that person benefits

indirectly." (alteration in original) (quoting *United States ex rel. Nehls v. Omnicare, Inc.*, No. 07

C 05777, 2013 WL 3819671, at *16 (N.D. Ill. July 23, 2013)).

      Regardless, Relator fails to adequately allege scienter because she does not allege facts to

support the inference that Myriad's conduct was knowing and willful.  42 U.S.C. § 1320a-

7b(b)(2).  To show an AKS violation, a relator must "allege facts supporting an inference that

[the] defendant intended to act in a way it knew was wrongful." *Suarez*, 2019 WL 4749967, at *13. Relator fails to include such allegations. For example, Relator does not allege either that (1) Myriad knew about the $15,000 quarterly payment from Reditus to Banno, or that (2) Banno knew about the $70 payments per referral from Myriad to Reditus. If Myriad knew that Reditus was paying Banno $15,000 quarterly, Myriad could possibly be said to have knowingly indirectly paid remuneration to Reditus in exchange for referrals from Banno. And if Banno knew about the $70 "case fees" Myriad paid to Reditus, Banno could possibly be said to have knowingly received remuneration in exchange for referrals. Relator's arguments as to why she has sufficiently alleged knowledge and willfulness for the AKS hinge on whether Myriad knew that the $70 case fees to Reditus were illegal. Resp. Myriad 8. Relator's theory is that Myriad was inducing referrals from Banno through its payments to Reditus, but that theory is wholly implausible absent any allegation that Myriad was aware of the relationship between Banno and Reditus. The Second Amended Complaint does not sufficiently allege the knowledge element of an AKS violation with respect to Myriad, Banno, or Midwest.

Relator has also not properly alleged that Reditus violated the AKS with respect to this scheme. Though she alleges that Reditus paid remuneration to Banno (in the form of $15,000 quarterly payments), Banno did not make referrals to Reditus in exchange for that remuneration based on the allegations of this third scheme. Though Relator mentions the EKRA and the Stark Law in her responses, *see, e.g.*, Resp. Myriad 8, she again fails to develop any claim based on these statutes, so any argument that this scheme violated EKRA or the Stark Law is waived.

The FCA, IFCA, and IICFPA claims against Myriad, Banno, Midwest, and Reditus based on the allegations of the third scheme are DISMISSED.

Lawrence, Tri County, and Aaron argue that the Second Amended Complaint does not include sufficient allegations to hold them liable for any claims arising out of this scheme. *See* Lawrence & Tri County Mem. Supp. Mot. Dismiss 5; Aaron Mem. Supp. Mot. Dismiss 9–10. Relator acknowledges that it has not stated any allegations against Tri County with respect to this scheme but argues that Lawrence can be held liable because he was president of Reditus and the "co-architect of all the Defendants' schemes," Resp. Lawrence & Tri County 18, and that Aaron can be liable because she alleges that he was personally involved in the scheme, Resp. Aaron 9– 10 (citing Second Am. Compl. ¶¶ 135–53).  Any claim against Tri County based on this scheme is DISMISSED.  Because Relator does not identify the specific actions Lawrence took with respect to this scheme, the claim is DISMISSED against him as well.  And contrary to Relator's arguments, she does not allege any actions taken by Aaron with respect to this scheme.  Indeed, he is only mentioned one time in this section of the Second Amended Complaint and only to explain that Banno had been working with Aaron toward a joint venture in a different arena.  *See* Second Am. Compl. ¶ 141.  Any claim against Aaron with respect to this scheme is also DISMISSED.

### 4.  Scheme 4: Billing Software and COVID-19 Testing by Aaron and Reditus

For the fourth and final scheme, Relator alleges that Aaron and Reditus rigged the Reditus billing software to auto-populate, *i.e.*, "automatically add a charge or diagnosis code," even when services had not actually been performed or a diagnosis had not actually been made. Second Am. Compl. ¶¶ 154–64.  As an example, "Reditus routinely submitted claims" for nail PCR tests which included CPT diagnostic codes for certain services—namely, CPT Codes 87481 (Candida DNA), 87500 (Vanomycin DNA), 87640 (Staph A), 87651 (Strep A), and 87653 (Strep B) —that were not provided as part of the nail PCR panel.  *Id.* ¶ 155.  Reditus's billing software also auto-populated a decalcification diagnostic code (CPT 88311) "to tests done on nails, and

43

this charge [was] always inappropriate, as decalcification is never performed on a nail." *Id.*

¶ 156.  Relator gives one representative example of a claim submitted by Reditus to CareSource

Indiana.  *Id.*  Relator states that the billing software also auto-populated CPT Code 88305 on all

nail tissue test claims but this code "is not typically applicable to nails" and that the code

typically used for nail pathology tests provided a lower reimbursement.  *Id.* ¶ 157.

Relator alleges that Aaron and Reditus also "knowingly submitted countless" claims for

payment for COVID-19 tests to the government even when patients were already covered by

private insurance.  *Id.* ¶¶ 162–64.  Aaron told Relator on several occasions in 2021 that he bills

the government for COVID-19 testing even when a patient has private insurance because "it's

guaranteed" and "payment is faster."  *Id.* ¶¶ 161–64.  Relator alleges that, even though it was

"highly unusual" for a physician to personally submit claims for payment, "Aaron Rossi would

sit at his computer, submit bills, and say words to the effect of 'cha-ching'--like he was hitting a

cash register or slot machine.  He therefore was not interested in whether there was [COVID-19]

exposure or a medical necessity for the testing but, instead, was submitting claims solely for the

financial incentive to fund his lucrative lifestyle."  *Id.* ¶ 161.  Relator gives one representative

example of a claim for a COVID-19 test submitted by Reditus to the Illinois Department of

Public Health – Rockford despite Reditus knowing that the patient was covered by Blue Cross

Blue Shield.  *Id.* ¶ 164.

Reditus argues that Relator does not allege any false claim with granularity nor does she

provide "'specific facts demonstrating what occurred at the individualized transactional level,' as

she is required to do to maintain a claim."  Reditus Mem. Supp. Mot. Dismiss 12–14 (quoting

*Lanahan*, 41 F.4th at 862).  Reditus further argues that Relator's allegations regarding the routine

manual entry and the auto-population of codes in the billing system for the same type of tests are

contradictory and that "Relator never alleges that Reditus submitted a claim it knew to be false under any of the listed CPT codes." *Id.* at 12–13. With respect to the COVID-19 test claims, Reditus asserts that Relator does not provide the terms of the government contracts or any patients' insurance policies and simply alleging that claims for COVID-19 tests "'should' have been paid by private insurers instead of the State of Illinois" insufficient. *Id.* at 13.

Aaron adopts many of Reditus's same arguments, often verbatim, and adds that Relator has not alleged how Aaron specifically "routinely caused" Reditus's billing software to auto-populate codes. Aaron Mem. Supp. Mot. Dismiss 10–12. Aaron also argues that Relator's allegations about Aaron's "quirky habit" of saying "cha-ching" as he submitted claims for payment does not link Aaron's "alleged eccentricity" with any specific false claim submissions. *Id.* at 11.

Relator fails to specifically plead the circumstances of the auto-population scheme at least with respect to the nail test claims. She identifies only one allegedly representative example but that example seems to involve one particular CPT Code (88311) whereas the remainder of the allegations are about different CPT codes. *Compare* Second Am. Compl. ¶ 156 (alleging that Reditus submitted claims for payment to CareSource Indiana for a patient and that "[n]one of these services were provided in connection with this sample," though not actually alleging that the claim was billed under CPT Code 88311 or explaining what "these services" refers to). Moreover, she does not identify how the auto-population worked—she seems to indicate that multiple codes would be auto-populated for nail tests and does not clarify this in response to Reditus and Aaron's arguments that her allegations are contradictory. *See* Resp. Reditus 18 ("Its claim that these allegations are contradictory misstates the allegations, which viewed in context conclusively establish that upcoded claims were by necessity submitted.").

Additionally, Relator does not allege who was responsible for setting up or coding the billing system or any specifics of how an auto-populated code ended up being included in a claim for payment.  The Court cannot find that Relator has pleaded the who, what, where, when, and how of this scheme as is required under Rule 9(b).  Any FCA, IFCA, or IICFPA claim based on these allegations is DISMISSED.

The Court finds, however, that Relator has sufficiently pleaded her allegations regarding fraudulent billing for COVID-19 tests with the requisite particularity.  Relator gives a specific representative example of a claim for payment submitted to the State of Illinois and alleges that Aaron himself submitted claims for payment on behalf of Reditus.  Knowledge can be alleged generally, *see* Fed. R. Civ. P. 9(b), and here, Relator has alleged that Aaron intentionally chose to bill the government, rather than private insurers, for COVID-19 tests simply due to expediency.

As alleged, Relator has properly stated a claim for violation of the IFCA with specific facts showing (1) the existence of claims which were (2) submitted by Aaron and Reditus which (3) they knew were false at the time they submitted them.  *See* 740 ILCS 175/3(a)(1).  Because Relator specifically alleges that Reditus and Aaron billed government payors instead of private insurance companies, she has not alleged a violation of the IICFPA.  *See* 720 ILCS 5/17-10.5(a)(1) (providing that a person commits insurance fraud by making a false claim to an insurance company).  Relator alleges that Reditus was awarded hundreds of millions of dollars as part of contracts for COVID-19 testing with the State of Illinois, Second Am. Compl. ¶ 159, but does not provide similar allegations regarding COVID-19 testing and the federal government. She also does not provide any representative example of a claim based on these allegations

submitted to Medicare for payment.  Accordingly, the Court finds that Relator has not stated a claim for an FCA violation based on these allegations for this fourth scheme.

Lawrence and Tri County again argue that Relator has not alleged their involvement in this scheme either.  *See* Lawrence & Tri County Mem. Supp. Mot. Dismiss 6–7.  Relator's response is that Lawrence was president of Tri County and Reditus and the entities were intertwined.  *See* Resp. Lawrence & Tri County 18.  Again, these conclusory allegations are not sufficient to state with particularity what these Defendants' roles were in the scheme.  Any claim against Lawrence and Tri County arising out of this scheme is also DISMISSED.

In sum, only an IFCA claim that Aaron and Reditus billed the state instead of private payors for COVID-19 tests survives out of this scheme.

### v.  Alter Ego Theory of Liability

In the alternative, Aaron argues Relator has failed to plead with particularity the requisite elements of an alter ego theory and therefore the claims against Aaron, AJR Diagnostics, AJR Consulting, RLL Aviation, and PR Manufacturing should be dismissed.  Aaron Mem. Supp. Mot. Dismiss 8–9 ("Relator wholly fails to allege that . . . the [corporate defendants] were a mere instrumentality of any other Defendant [or that] the fiction of separate existence would sanction fraud or promote injustice.").  Relator responds that the caselaw is not settled regarding whether allegations supporting an alter ego theory must be pleaded with particularity, but regardless she has sufficiently pleaded facts with enough specificity to survive a motion to dismiss.  Resp. Aaron 8–10.

The Seventh Circuit has not articulated the appropriate pleading standard for alter ego liability when fraud allegations are at stake.  And district courts "are all over the board on the issue" with some applying the heightened standard of Rule 9(b)'s particularity requirements and others applying the lower standard of Rule 8(a)'s notice requirements.  *Deschepper v. Midwest*

*Wine & Spirits, Inc.*, 84 F. Supp. 3d 767, 781 (N.D. Ill. 2015) (quotation marks omitted).

*Compare In re Mack Indus. Ltd.*, No. 22 C 606, 2024 WL 989406, at *6 (N.D. Ill. Mar. 7, 2024)

("The [plaintiff's] alter–ego veil-piercing claims are based on allegations of fraudulent conduct;

therefore, Rule 9(b) is the appropriate pleading standard for her fraud claims."), *and Superkite*

*PTY Ltd. v. Glickman*, No. 12-cv-7754, 2014 WL 1202577, at *3 (N.D. Ill. Mar. 21, 2014)

("[S]everal courts within this district have held that generally Rule 9(b) does not apply to veil

piercing allegations. . . . However, courts within this district have also noted that there is an

exception to this general rule where the court is asked to pierce the corporate veil to establish

liability for a claim of fraud." (citations omitted)), *with UIRC-GSA Holdings Inc. v. William*

*Blair & Co.*, 289 F. Supp. 3d 852, 859 (N.D. Ill. 2018) ("[T]o state an alter ego theory, plaintiffs

typically are only required to satisfy the notice pleading standards of Rule 8(a)." (quotation

marks omitted)), *and Flentye v. Kathrein*, 485 F. Supp. 2d 903, 912–13 (N.D. Ill. 2007)

("[Defendant] argues that to the extent the alleged alter ego relationship is premised on fraud,

Plaintiffs must satisfy Federal Rule of Civil Procedure 9(b).  However, . . . [t]o state a veil-

piercing claim, Plaintiffs typically are only required to satisfy the notice pleading standards of

Rule 8(a).").

Though the Seventh Circuit has not weighed in on the pleading standard for alter ego

liability related to fraud claims specifically, it has emphasized that, when reviewing alter ego

allegations generally, district courts must be mindful of "[t]he liberal pleading standard in Rule 8

and the presumptions accorded to nonmovants on dispositive motions."  *Boim v. Am. Muslims*

*for Palestine*, 9 F.4th 545, 559 (7th Cir. 2021).  Moreover, "[d]ismissals on the pleadings 'should

be granted sparingly and with caution to make certain that the plaintiff is not improperly denied a

right to have his claim adjudicated on the merits.'"  *Id.* at 558–59 (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1349 (4th ed.)).

Relator's alter ego theory is not a standalone claim but instead is "a procedural mechanism for allowing liability on a substantive claim."  *RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, No. 09 C 4523, 2010 WL 3307084, at *5 (N.D. Ill. Aug. 18, 2010) (citing *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 736 (7th Cir. 2004)).  "Where a claimant fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss will be denied."  *United States v. Sullivan*, No. 10 CR 821-1, 2016 WL 1626622, at *10 (N.D. Ill. Apr. 21, 2016) (alterations and quotation marks omitted).

Under Illinois law, to pierce the corporate veil on an alter ego theory, a plaintiff must allege that "(1) there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) adhering to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences."  *Spiegel v. Carlson*, No. 1:15-cv-01809, 2016 WL 5477529, at *9 (N.D. Ill. Sept. 29, 2016) (quotation marks omitted).  In determining whether a "unity of interest and ownership" exists, Illinois courts consider numerous factors, including: "commingling funds; diverting assets to an owner or other entity to creditor detriment; failing to maintain an arm's-length relationship among related entities; and whether the corporation is a mere façade for a dominant owner."  *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012) (citing *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005)).

Relator alleges that AJR Diagnostics, AJR Consulting, RLL Aviation, and PR Manufacturing are alter egos formed by Aaron to avoid liabilities.  Second Am. Compl. ¶¶ 16,

180–87.  AJR Diagnostics is a laboratory formed by Aaron and Lawrence in October 2022 to divert or retain government funds that were fraudulently obtained because, at that time, Reditus was entangled in drawn-out litigation and Aaron had been federally indicted.  *Id.* ¶ 16.  Aaron formed AJR Consulting and RLL Aviation to safeguard expensive purchases—including airplanes and luxury vehicles—that he had bought with ill-gotten Reditus funds.  *Id.*  Aaron additionally used Reditus cash and assets to purchase real property—including condominiums and a $3.5-million hunting estate—which served no legitimate business purpose for Reditus and then titled the property in the name of AJR Consulting.  *Id.* ¶¶ 184–85.  Further, Aaron used over $6 million of Reditus funds to settle a dispute with his former partners and purchase an interest in PR Manufacturing but did but did not transfer that interest to Reditus.  *Id.* ¶ 183.  He also transferred Reditus funds to pay the expenses of these corporate entities including over to $2.1 million to one entity and $836,026 to PR Manufacturing.  *Id.* ¶ 186.

Considering Relator's allegations and weighing the above-stated factors, the Court finds that Relator has properly alleged a unity of interest and ownership with facts supporting the notion that Aaron commingled funds among the various entities he controlled, diverted assets and funds to different entities to shield them from creditors, and overall treated the various entities as mere alter egos of himself and Reditus.  Based on the facts alleged, allowing Aaron to escape liability for his actions using the guise of the corporate form would sanction fraud and promote injustice and the Court finds that Relator has adequately pleaded an alter ego theory with respect to Aaron, AJR Diagnostics, AJR Consulting, RLL Aviation, and PR Manufacturing.

### c. Count VI: Retaliation in Violation of FCA, IFCA, IICFPA, and IWA (against Aaron, Lawrence, and Reditus)

Relator alleges the Reditus Defendants harassed, threatened, and ultimately fired her in retaliation for her "investigation, opposition and attempts to stop their fraudulent billing

practices."  Second Am. Compl. ¶ 223.  She brings retaliation claims against Aaron, Lawrence, and Reditus pursuant to the FCA, IFCA, IICFPA, and IWA.  *Id.* ¶¶ 219–26.

The FCA provides anti-retaliation protections for an employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action" alleging FCA violations.  31 U.S.C. § 3730(h)(1).  Such an employee "shall be entitled to all relief necessary to make that employee . . . whole."  *Id.* The IFCA and IICFPA contain nearly identical provisions.  740 ILCS 175/4(g)(1) ("[A]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done . . . in furtherance of an action" alleging IFCA violations); 740 ILCS 92/40 ("An employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee . . . in furtherance of an action" alleging IICFPA violations "shall be entitled to all relief necessary to make the employee whole.").

Reditus presents no arguments to undermine Relator's retaliation claim and accordingly, the retaliation claim against Reditus can proceed.  *See* Fed. R. Civ. P. 12(h)(1)(B) (explaining that a party waives certain defenses, including failure to state a claim, if that party fails to include it in a motion or responsive pleading).

Lawrence and Aaron's only argument for dismissal is that there is no individual liability under the FCA, IFCA, or IICFPA.  Lawrence & Tri County Mem. Supp. Mot. Dismiss 19–20; Aaron Mem. Supp. Mot. Dismiss 21.  Lawrence cites a slew of district court cases to support this

argument.  *E.g.*, *United States ex rel. Sibley v. A Plus Physicians Billing Serv., Inc.*, No. 13 C 7733, 2015 WL 4978686, at *5 (N.D. Ill. Aug. 20, 2015) (granting motions to dismiss because "§ 3730(h) [does] not create individual liability for FCA retaliation claims").  In the cases Lawrence cites, however, the dispositive fact was not that the defendants were *individuals*— rather it was that the defendants were not alleged to be *employers*.  *E.g.*, *Nance v. EMAGES, Inc.*, No. 20 C 6316, 2022 WL 2116581, at *4 (N.D. Ill. June 13, 2022) ("Plaintiff has not alleged that [the individual defendant] was his employer, and there is no 'individual liability for FCA retaliation claims.'" (quoting *Sibley*, 2015 WL 4978686, at *5)); *Perez-Garcia v. Dominick*, No. 13 C 1357, 2014 WL 903114, at *6 (N.D. Ill. Mar. 7, 2014) (dismissing the plaintiff's retaliation claims to the extent the defendants were sued "in their individual capacities").  Here, in contrast, Relator alleges Lawrence and Aaron were her employers.  *See, e.g.*, Second Am. Compl. ¶ 221 ("During her employment, [Relator] worked for the Reditus Defendants [*i.e.*, Aaron, Lawrence, and Reditus] . . . .").

Moreover, in addition to the FCA, IFCA, and IICFPA, Relator also based her retaliation claim on the IWA and "[t]he plain text of the [IWA] provides for individual liability."  Resp. Lawrence & Tri County 19.  Under the IWA, an employer may not retaliate against an employee who refuses to participate in illegal activity or who discloses public corruption or wrongdoing. 740 ILCS 174/15–20.  An employee who was retaliated against can sue the employer "for all relief necessary to make the employee whole."  740 ILCS 174/30.  The IWA's definition of "employer" includes "an individual" or other entity that has employees in Illinois and "any person acting within the scope of his or her authority express or implied on behalf of those entities in dealing with its employees."  740 ILCS 174/5.  Relator argues Aaron and Lawrence are liable for retaliation under the IWA because they are "individuals" who acted within the

52

scope of their authority on behalf of Reditus and Tri County when they terminated Relator "in retaliation for her opposition and refusal to participate in Defendants' schemes." Resp. Aaron 23; Resp. Lawrence & Tri County 19. Aaron, Lawrence, and Reditus's motions to dismiss Count VI are DENIED.

### d. Count VIII: Breach of Contract (against Tri County only)

Relator brings a breach of contract claim against Tri County, alleging that Tri County terminated her without good cause in violation of her employment agreement. Second Am. Compl. ¶¶ 236–41. Relator had a written employment agreement with Tri County pursuant to which she would work for Tri County for two years beginning July 6, 2021. *Id.* ¶¶ 237–38; LaGatta–Tri County Contract § 4.1, Lawrence & Tri County Mem. Supp. Mot. Dismiss Ex. A, ECF No. 49-1.[8] The contract provided that either party could terminate the agreement "without cause or penalty upon one hundred twenty (120) days' prior written notice to the other [p]arty." LaGatta–Tri County Contract § 4.2(h). Relator was terminated on June 15, 2022. Second Am. Compl. ¶¶ 7, 177, 225.

In Illinois, to plead a breach of contract claim, "a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d

---

[8] A court can consider documents attached to a motion to dismiss where those documents "are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993). For example, if a plaintiff alleges breach of contract but does not attach the contract to the complaint—which is not required—a defendant may introduce the contract as an exhibit attached to a motion to dismiss. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 n. 4 (7th Cir. 2003). "The court can properly consider such a document without converting the motion to dismiss to a motion for summary judgment." *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011) (citing *Chemetall GMBH*, 320 F.3d at 718 n.4). The LaGatta–Tri County Contract was referenced in the complaint, *see, e.g.*, Second Am. Compl. ¶ 237–40, and is central to her breach of contract and IWPCA claims. Moreover, Relator does not object to the Court considering the contract at this stage. *See NC Cap., LLC v. Metabolomic Techs., Inc.*, 594 F. Supp. 3d 1073, 1077 n.2 (C.D. Ill. 2022).

960, 967 (Ill. App. Ct. 2004)).  Tri County asserts that Relator "cannot sue for breach of contract without alleging and proving that she has substantially complied with all of the material terms of an agreement."  Lawrence & Tri County Reply 17, ECF No. 84-1 (citing *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011)).  But *Costello* involved summary judgment and the quoted language from Tri County's Reply misstates Relator's burden at the motion to dismiss stage. *Compare Twombly*, 550 U.S. at 555 (finding that, at the motion to dismiss stage, a court must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"), *and Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (finding that, at the summary judgment stage, "a complete failure of proof concerning an essential element of the nonmoving party's case" entitles the moving party to judgment as a matter of law).

Relator's essential argument is that because she alleges she was terminated without cause, it necessarily follows that she substantially performed her contractual obligations.  Resp. Lawrence & Tri County Mot. Dismiss 20–21.  In other words, if Relator had *not* substantially performed under the contract, she could have been terminated *for cause*.  Drawing all reasonable inferences in Relator's favor, the Court agrees with Relator that she has sufficiently alleged the substantial performance element of her breach of contract claim.  *See Petri v. Gatlin*, 997 F. Supp. 956, 966 (N.D. Ill. 1997) (holding that "specific facts demonstrating the plaintiff['s] compliance with each and every provision of [the] contract[] is simply not necessary at this stage of the proceedings").  Tri County's motion to dismiss Count VIII is DENIED.

### e.   Count IX: IWPCA (against Aaron, Lawrence, Reditus, and Tri County)

Relator asserts that she is owed payment under the IWPCA because her employment contract was terminated over one year early without good cause.  Second Am. Compl. ¶¶ 242–48.  The IWPCA requires employers to "pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled

54

payday for such employee." 820 ILCS 115/5. Final compensation includes "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." *Id.* 115/2. Where a plaintiff claims she is owed payment after separation under the IWPCA, the plaintiff must allege that that "(1) the defendant was an 'employer' as defined in the [IWPCA]; (2) the parties entered into an 'employment contract or agreement'; and (3) the plaintiff was due 'final compensation.'" *Bradley v. Village of University Park*, 59 F.4th 887, 903 (7th Cir. 2023) (quoting *Catania v. Local 4250/5050 of the Commc'n Workers*, 834 N.E.2d 966, 972 (Ill. App. Ct. 2005)); *see also Brown v. Lululemon Athletica, Inc.*, No. 10 C 05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 24, 2011) ("It is well established that an employee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed.").

Defendants argue Relator's IWPCA claim should be dismissed because future unearned compensation is not recoverable under the IWPCA. Lawrence & Tri County Mem. Supp. Mot. Dismiss 21–22; Reditus Mem. Supp. Mot. Dismiss 16–17; Aaron Mem. Supp. Mot. Dismiss 21. Relator concedes that the IWPCA generally does not allow recovery of future wages but asserts that she is still owed 120 days' wages because the contract requires 120 days' notice before termination without cause and she was terminated "summarily with no prior notice." Resp. Lawrence & Tri County 21–22. But the contract only requires 120 days' notice "after the first anniversary of the Effective Date," *i.e.*, July 6, 2022. LaGatta–Tri County Contract § 4.2(h). Relator was terminated on June 15, 2022, just a few weeks shy of her one-year anniversary.

Relator does not explain why the 120 days' notice still applies to her claim in light of the fact she was terminated before July 6, 2022.

Moreover, Relator provides no legal justification for why the requirement for 120 days' notice before termination constitutes entitlement to 120 days' wages as "final compensation." The two cases Relator cites in support of her argument are inapposite because they involved severance payments. In *Elsener v. Brown*, 996 N.E.2d 84 (Ill. App. Ct. 2013), the court upheld the verdict on the employee's IWPCA claim because his contract expressly provided for severance pay if the employee were to be involuntarily terminated prior to the expiration of his contract. *See* 996 N.E.2d at 87–88 ("Upon an Involuntary Termination of the employment relationship by Employer prior to expiration of the Term, Employee shall be entitled . . . to receive his pro rata salary through the date of such termination plus the severance amount" which is "the remaining amount of his base salary through expiration of the Contract Term if he is terminated not for cause." (alterations omitted)). In *Swift v. DeliverCareRx, Inc.*, No. 14 C 03974, 2015 WL 3897046 (N.D. Ill. June 23, 2015), the court found that the employee could proceed with his IWPCA claim because his contract provided for "Termination Payments" which the court decided "fit the definition of severance" and held that the "Termination Payments do count as final compensation under the [IWPCA]." *Swift*, 2015 WL 3897046, at *6; *see also id.* ("A severance payment is a bargained-for benefit of termination, earned by signing the contract and agreeing to forgo other opportunities."). Relator has not provided any legal support for her argument that the requirement 120 days' notice prior to termination creates a legal entitlement to 120 days' wages as "final compensation" to which she would be entitled as a separated employee.

The Court finds that Relator has not sufficiently alleged a violation of the IWPCA.

Aaron, Lawrence, Reditus, and Tri County's motions to dismiss Count IX are GRANTED.

## CONCLUSION

For the foregoing reasons, the motions to dismiss filed by Defendants Myriad Genetics Laboratories, Inc. ("Myriad"), ECF No. 33; MDxHealth, Inc. ("MDx"), ECF No. 79; and Bryan Zowin, ECF No. 46, are GRANTED.  The motions to dismiss filed by Lawrence Rossi, M.D. ("Lawrence") and Tri County Anesthesia, S.C. d/b/a Tri-County Pathology Group ("Tri County"), ECF No. 48; Joseph J. Banno, M.D. and Midwest Urological Group, Ltd. ("Midwest"), ECF No. 50; Reditus Laboratories, LLC ("Reditus"), ECF No. 63; and Aaron Rossi ("Aaron"), AJR Diagnostics, LLC, AJR MD Consulting, LLC, RLL Aviation, LLC, and PR Manufacturing LLC, ECF No. 71, are GRANTED IN PART and DENIED IN PART.  Counts I (FCA), IV (IFCA), and V (IICFPA) against Myriad, MDx, and Zowin are DISMISSED WITHOUT PREJUDICE.  Counts II (AKS), III (Stark Law), and VII (EKRA) against all Defendants are DISMISSED WITH PREJUDICE.  Count IX (IWPCA) is DISMISSED WITHOUT PREJUDICE.  The motions for leave to file replies, ECF Nos. 82, 83, 84, 85, 86, & 92, are GRANTED.  The Clerk is directed to file the proposed replies, ECF Nos. 82-1, 83-1, 84-1, 85-1, 86-1, & 92-1, on the docket.

The claims remaining are: Count I (FCA), Count IV (IFCA), and Count V (IICFPA) against Reditus and Aaron based on Scheme 1(C), *i.e.*, overbilling and using improper diagnostic codes; Count I (FCA), Count IV (IFCA), and Count V (IICFPA) against Banno, Midwest, and Reditus based on Scheme 2, *i.e.*, kickbacks and referrals among Banno, Midwest, and Reditus; Count IV (IFCA) against Aaron and Reditus based on Scheme 4, *i.e.*, fraudulent billing for COVID-19 testing; all surviving claims based on an alter ego theory against Aaron, AJR

Diagnostics, LLC, AJR MD Consulting, LLC, RLL Aviation, LLC, and PR Manufacturing LLC;

Count VI (Retaliation) against Aaron, Lawrence, and Reditus; and Count VII (Breach of

Contract) against Tri County.

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a "court should freely give leave"

to amend a complaint "when justice so requires."  Relator is granted leave to file an amended

complaint, if she so desires, to address the deficiencies identified in this Order by October 15,

2024.  Answers from Lawrence, Tri County, Banno, Midwest, Reditus, Rossi, AJR Diagnostics,

LLC, AJR MD Consulting, LLC, RLL Aviation, LLC, and PR Manufacturing LLC are due

within fourteen days.  *See* Fed. R. Civ. P. 12(a)(4)(A).

Entered this 30th day of September, 2024.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE