# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF ILLINOIS *ex rel.* LORINE LAGATTA,<br><br>    *Plaintiff,*<br><br>v.<br><br>REDITUS LABORATORIES, LLC; TRI-COUNTY ANESTHESIA SC; MYRIAD GENETICS LABORATORIES, INC.; MIDWEST UROLOGICAL GROUP, LTD.; AARON ROSSI; JOSEPH BANNO; LAWRENCE ROSSI; AJR DIAGNOSTICS, LLC; AJR MD CONSULTING, LLC; RLL AVIATION, LLC; PR MANUFACTURING ENTERPRISES, LLC; BRYAN ZOWIN; MDXHEALTH, INC.,<br><br>    *Defendants,*<br><br>v.<br><br>ROBIN POTTER; ROBIN POTTER & ASSOCIATES, P.C.,<br><br>    *Interested Parties.* | Case No. 1:22-cv-01203-SLD-RLH |

## ORDER & OPINION

Attorneys, no less than judges, promise to uphold the rule of law. But they also must earn a living. To do so, they charge clients in various ways—from contingency fees to fixed hourly rates. And to maximize efficiency, they join firms that divide labor and specialize. Sometimes those arrangements work out; other times, they fracture.

When they do, clients and courts are left holding the briefcase. The fee dispute here offers an example.

When Plaintiff Lorine LaGatta filed this qui tam action in 2022, she was represented by David Fish and Robin Potter—then both members of the firm Fish, Potter, Bolaños. Potter resigned, and Fish continued to represent LaGatta. When Potter learned that LaGatta had reached a putative settlement with nine defendants, she filed several attorney's liens against LaGatta's anticipated recovery. Deeply troubled by the impact of those liens on the settlement process, LaGatta moved to declare them invalid. (Doc. 115.) This Order resolves that motion, along with Potter's Motion to Stay. (Doc. 145.)

Potter asks the Court to hold off on LaGatta's motion because she and Fish are involved in a separate mediation. But the mediation is no reason to wait, so Potter's motion to stay, (Doc. 145), will be denied. As to the merits, attorney's liens are a creature of state law, so the validity of Potter's liens turns on the application of Illinois law. But the Illinois Attorney's Liens Act did not authorize Potter's liens, nor do equitable or common-law principles supply an alternative basis for them. The liens fail, so LaGatta's motion to declare them invalid, (Doc. 115), will be granted.

## BACKGROUND

To say LaGatta's motion to adjudicate liens has been over-litigated would be generous. In the two dozen or so filings since August 2025, LaGatta and Potter have fought tooth-and-nail over almost every aspect of their dispute. But until recently, they agreed on one thing: This Court can and should resolve it. Now, they don't agree on even that proposition.

To frame the dispute, the Court details who Robin Potter is before turning to her involvement with David Fish, his firm, and this lawsuit. The Court then recounts Potter's resignation, her attorney's liens, and their effect on this proceeding.

## A.    Factual Background

Robin Potter is a lawyer who began working for the firm, Fish Potter Bolaños P.C., in September 2021. (Doc. 115-4 at 2.) Under her contract, she was to be "a Shareholder . . . and an independent contractor non-employee of the firm." (Doc. 115-4 at 2.) Rather than draw a salary, Potter's compensation was to be calculated by multiplying the number of hours she worked on any of the firm's cases by her lodestar rate—i.e., $700 per hour or "such other agreed upon amount." (Doc. 115-4 at 3.) The agreement was freely terminable by either party upon thirty days' notice. (Doc. 115-4 at 4.) After termination, Potter was entitled to payment "for work and referral fees earned prior to the termination date," meaning that her right to compensation would survive her relationship with the firm. (Doc. 115-4 at 4.) The agreement also provided for mediation and—if unsuccessful—binding arbitration of "any disputes between" the parties.[1] (Doc. 115-4 at 4.)

Fast forward to June 2022, when LaGatta filed her complaint. (Doc. 1.) It was signed by David J. Fish, who was then—and remains today—lead counsel for LaGatta and a member of Fish Potter Bolaños.[2] (Doc. 1 at 35.) Potter also appeared in the case

---

[1] The Agreement was signed by Robin Potter, on the one hand, and "M. Nieves Bolanos," the firm's president, on the other. (Doc. 115-4 at 5.)

[2] The Fish Potter Bolaños firm was renamed in June 2024 to "Workplace Law Partners, P.C." but otherwise remained the same entity. (Doc. 93.) For consistency, the Court will refer to the firm as Fish Potter Bolaños throughout this Order.

as counsel for LaGatta. (Doc. 9.) Sometime during these proceedings, Potter's relationship with Fish Potter Bolaños soured. It officially ended on May 31, 2024, when Potter tendered a resignation letter to Fish. (Doc. 115-5.) Upon her departure, Potter executed a separation agreement that established the parties' respective post-employment obligations. (*See* Doc. 119-3 at 1–6.) As relevant here, the agreement clarified which cases would stay with the firm and which ones would follow Potter. (Doc. 119-3 at 6.) LaGatta's case was among those that would remain with Fish and the firm. (Doc. 119-3 at 6.) But if LaGatta ultimately prevailed (via settlement, a judgment, or otherwise), Potter would "receive[] her proportional lodestar for her work performed on the case as a non-originating attorney."[3] (Doc. 119-3 at 6.) The Court had no knowledge of Potter's resignation until over a year later when, in July 2025, Potter moved to withdraw as counsel, stating that she was "no longer employed or affiliated with Workplace Law Partners, P.C. (f/k/a Fish Potter Bolaños, P.C.)." (Doc. 113.)

In short, Potter was a member of the firm when the case began, appeared on LaGatta's behalf, worked on the matter, and resigned while the case was ongoing. At first blush, this appears to be precisely the situation contemplated by the agreement's termination provision—that is, Potter performed billable work on one of the firm's

---

[3] The separation agreement also requires the parties to "keep each other reasonably updated on the status of the matters that they are working on and for which the other Party has an interest and to cooperate to support fee requests as necessary." (Doc. 119-3 at 4.) Potter directs much of her effort to attacking Fish for failing to honor this provision. But as outlined below, that question is beyond the scope of LaGatta's motion to adjudicate and thus irrelevant.

cases,[4] and then left before the case was over and any attorney's fees were collected. Under Potter's original compensation agreement—and the separation agreement she signed later—she would appear to have a contractual right to be paid for her work on LaGatta's case.

So what's the problem? What happened in the year between Potter's resignation and the onset of the current dispute? From what the Court can gather, Potter got wind that LaGatta's case was on the brink of reaching a settlement. (Doc. 115 at 3.) So she demanded that Fish turn over billing records and a copy of the settlement agreements (presumably to calculate the money she was owed under the separation agreement). (Doc. 119-1 at 6.) Fish refused, and Potter threatened to file attorneys' liens against Potter's recovery. (Doc. 115 at 3.) Fish met Potter's threat with one of his own: He emailed Potter to "memorialize the controlling case law that prohibits" Potter "from asserting an attorney's lien under the present circumstances." (Doc. 115-8 at 2.) The email also cautioned Potter that "any attempt to assert a lien at this stage would constitute a false representation of [her] legal rights" and potentially "expose [her] to liability." (Doc. 115-8 at 2.)

Undeterred, Potter served (at least) four notices of attorney's liens on the United States, (Doc. 115-6 at 2), Defendant Reditus Laboratories, (Doc. 115-6 at 4), Defendant Myriad Genetic Laboratories, Inc., (Doc. 142-1 at 2), and David Fish

---

[4] LaGatta and Potter disagree over the extent of Potter's involvement in the case. LaGatta says that her contact with Potter was "very limited," (Doc. 115-1 at 1); Potter retorts that she was the firm's "False Claims Act/Qui Tam expert" and that Lagatta's "case would not have been filed without my work and efforts," (Doc. 119-1 at 3). The two are not inherently inconsistent: Potter may well have performed a great deal of non-client facing work on the case. In any event, the extent of Potter's work on the case is not germane to the lien dispute, so the Court need not resolve the disagreement.

himself, (Doc. 115-6 at 6). The notices assert that LaGatta "placed in our hands as her attorneys for suit or collection certain claims, demands, or causes of action and damages that she has against Defendants . . . ."[5] (Doc. 115-6 at 6.) They also state that Potter "claim[s] a lien and/or payment in any money . . . that [LaGatta] . . . may recover for these claims, causes of action and in this litigation." (Doc. 115-6 at 6.)

### B.    Procedural Background

As the Court previously observed, Potter's lien notices threw "a wrench into the parties' settlement agreement" because "they prevent[ed] the defendants from dispersing the settlement funds, which in turn . . . prevent[ed] LaGatta from releasing her claims." (Doc. 135 at 3.) Within days, LaGatta moved to declare them invalid. (Doc. 115.) The Court allowed Potter to appear in the case as an "interested party" and gave her the opportunity to contest the motion, which she did.[6] (Doc. 119.) LaGatta replied, (Doc. 122), and moved to sanction Potter under Federal Rule of Civil Procedure 11,[7] (Doc. 127).

Meanwhile, nine of the settling defendants moved to deposit with the Court a portion of the settlement funds earmarked for LaGatta's attorney's fees ($500,000).

---

[5] The use of the plural "our" in the lien notices refers to both Robin Potter personally and the entity through which she now runs her legal practice: Potter & Associates, P.C. But the relevance of that entity to the lien dispute is altogether unclear. When Potter intervened in this case to defend her liens, she appeared on behalf of both herself individually and as counsel for "Robin Potter & Associates, P.C." (Doc. 116.) And in the many filings since, Potter has purported to speak for both herself and her firm. (*See, e.g.*, Doc. 119 at 1.) Yet the agreements between Potter, Fish, and Fish Potter Bolaños make no mention of "Robin Potter & Associates." (*See, e.g.*, Docs. 119-4 at 4, 119-6 at 2.) To avoid confusion, the Court treats Potter and her firm as the same person and proceeds as if Potter is asserting the liens on her own behalf.

[6] In her response, Potter included an exhibit, "Exhibit 8," that contained detailed billing records from a Workplace Law Partners matter on which she worked. LaGatta promptly moved to strike that exhibit because it contained attorney-client privileged information. (Doc. 121.) The Court granted the motion. (Text Order dated Oct. 27, 2025.)

[7] LaGatta's Motion for Sanctions, (Doc. 127), will be addressed in a separate order.

(Doc. 132 at 4.) The defendants explained that they could not honor their end of the bargain as long as Potter's liens remained outstanding. (Doc. 132 at 4.) Their request was granted, and the Court allowed the funds to be deposited in the Court's registry. (Doc. 135 at 7–8.)

Along with authorizing the deposit, the Court prompted LaGatta and Potter to file supplemental briefs addressing procedural and jurisdictional questions. (Doc. 135 at 7.) Both parties agreed that (1) LaGatta's Motion to Adjudicate Liens is procedurally sound, and (2) this Court has jurisdiction to decide it. (Docs. 141, 142.) Shortly after those briefs were filed, Potter notified the Court that she and Fish had scheduled a mediation "regarding the parties' disputes in this case." (Doc. 143.) The Court then issued a Text Order directing the parties to file a joint status report on the outcome of the mediation. (Text Order dated Dec. 12, 2025.) In their report, LaGatta reaffirmed her intent to pursue her motions to declare Potter's liens invalid and for sanctions. (Doc. 144 at 2.) Potter took issue with that position, instead asserting that it "is improper as a matter of law for Mr. Fish to pursue these or any other matters of dispute between them in this Court or at this time." (Doc. 144 at 2.) To that end, Potter filed a "Motion to Stay Proceedings," insisting that the ongoing mediation between her and her former firm "obviates the need for this Court to decide the matters in dispute." (Doc. 145 at 1.) LaGatta countered that the mediation has no bearing on her pending motions and urged the Court to resolve them once and for all. (Doc. 147 at 5.)

## DISCUSSION

Three threshold questions merit discussion: (1) the procedural posture of LaGatta's motion; (2) the Court's jurisdiction over it; and (3) whether the Court should await the outcome of the Potter-Fish meditation. As explained below, LaGatta's motion was procedurally sound, the Court has jurisdiction, and the Potter-Fish mediation does not warrant a stay. On the merits: the absence of an agreement between Potter and LaGatta is fatal to Potter's equitable lien theory. But the *presence* of an agreement between Potter and Fish defeats her quantum meruit arguments.

## I.   Procedure & Jurisdiction

LaGatta's Motion to Declare Liens Invalid raises two preliminary concerns. The first is whether a motion—rather than a complaint—is an appropriate way to obtain the relief LaGatta seeks. The second is whether the Court has jurisdiction to resolve the validity of Potter's liens. The Court afforded LaGatta and Potter an opportunity to give their two cents, and both answered each question in the affirmative. The Court agrees.

### A.   Procedural Grounds for LaGatta's Motion

A cursory review of the docket in this case would raise the eyebrows of anyone reasonably familiar with federal civil procedure. Generally, "[a] civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. Once the defendants are served, they may respond by filing an answer, *see* Fed. R. Civ. P. 12(a)(1), or appropriate motion, *see* Fed. R. Civ. P. 12(b). After the pleading stage, the court "must issue" a scheduling order, Fed. R. Civ. P. 16(b)(2), which triggers the parties' obligation to attend a scheduling conference, *see* Fed. R. Civ. P. 26(f)(1).

Discovery then begins, *see* Fed. R. Civ. P. 26(d)(1), and, more often than not, dispositive motions are filed, *see* Fed. R. Civ. P. 56(b).

That all happened here between June 2022 (when the complaint was filed) and September 2024 (when the Court partially granted defendants' motions for summary judgment). Settlement negotiations ensued, (*see* Docs. 109, 125), Potter withdrew her representation, (Doc. 113), and LaGatta settled with nine defendants. That was the procedural landscape when LaGatta filed her Motion to Adjudicate Liens. The Court's concerns arose because it appeared as if LaGatta's request—to "enter an order declaring each lien invalid," (Doc. 115 at 1)—was "tantamount to a declaratory judgment," which may be obtained only "upon the filing of an appropriate *pleading*." (Doc. 135 at 4 (quoting Declaratory Judgement Act, 28 U.S.C. § 2201).) By filing a motion in a pending case, LaGatta had not commenced a separate civil action for declaratory relief, as the Declaratory Judgment Act requires.

To allay the Court's concern, the parties cite two cases in which courts resolved similar disputes on a motion. The first is *Royce v. Michael R. Needle P.C.*, in which a law firm represented a plaintiff on a contingency basis. 950 F.3d 481, 484 (7th Cir. 2020). A dispute over fees arose, and the firm served a notice of attorney's lien. *Id.* It then filed with the court "a petition to adjudicate and enforce its attorney's lien," which was granted. *Id.* The second case is *Goyal v. Gas Technology Institute*, 718 F.3d 713 (7th Cir. 2013). There, the plaintiff retained counsel during pre-litigation settlement negotiations. *Id.* at 715. The negotiations were unsuccessful, and the representation ceased. *Id.* The plaintiff filed suit a year later, this time represented

by new counsel. *Id.* at 716. When the case settled, plaintiff's former counsel filed a notice of attorney's lien. *Id.* The plaintiff moved to quash the lien in the underlying proceeding, and the Court granted the motion. *Id.* at 717.

*Royce* and *Goyal* are instructive. To start, the posture of those cases mirrors this one: the courts confronted a motion to adjudicate a lien held by the plaintiffs' former lawyers. Neither court demanded a separate lawsuit; both deemed it appropriate to resolve the liens via motion. Although the courts did not squarely address procedure, *see generally Royce*, 950 F.3d 481; *Goyal*, 718 F.3d 713, LaGatta cites several cases in which other courts followed the same practice. *See, e.g.*, *Matthews v. Homecomings Fin. Network, Inc.*, 264 Fed. App'x 536 (7th Cir. 2008) (resolving motion to quash attorneys' lien); *Beesen-Dwars v. Duane Morris LLP*, No. 1:06-cv-5593, 2010 WL 551461 (N.D. Ill. Feb. 12, 2012) (same). Accordingly, LaGatta's motion—though atypical—is an appropriate way to resolve the parties' dispute.

## B.    Jurisdiction to Resolve LaGatta's Motion

The second threshold issue concerns not procedure but subject-matter jurisdiction, which this Court has an "independent duty to ensure" is properly invoked. *Cothron v. White Castle Sys.*, 20 F.4th 1156, 1160 (7th Cir. 2021); *see also Myers v. County of Lake*, 30 F.3d 847, 849 (7th Cir 1994) ("[F]ederal judges must respect the limits on their adjudicatory power even if all litigants are content with the decision.").

The Court previously observed that its jurisdiction over LaGatta's underlying claims is "not in doubt" because they arise under federal law. (Doc. 135 at 5.) It also

10

never questioned its jurisdiction over her state law claims, which fall "neatly within the Court's supplemental jurisdiction." (Doc. 135 at 5.) The Court observed, however, that the lien dispute arises from a set of facts that are entirely distinct from those that animate LaGatta's complaint. (Doc. 135 at 6.) It was therefore unclear whether the exercise of supplemental jurisdiction over LaGatta's motion was appropriate. The parties were asked whether Seventh Circuit precedent—in particular, *Baer v. First Option of Chicago, Inc.*, 72 F.3d 1294 (7th Cir. 1995)—supports the Court's exercise of jurisdiction. Again, both said yes.

Start with *Baer*, an employment-discrimination case that settled before trial. *See id.* at 1296. The plaintiff and his two lawyers had entered a complex fee-sharing agreement. *See id.* When the settlement was approved, a fee dispute arose. *See id.* The district court ordered the disputed funds to be held in escrow before ultimately awarding them to one of the lawyers. *See id.* at 1297. On appeal, the Seventh Circuit held that the district court had jurisdiction over the fee dispute for three reasons: (1) "the district court exercised affirmative control over the disputed fee"; (2) "[t]he court had jurisdiction to approve the parties' independently negotiated settlement"; and (3) the statute that conferred the cause of action "vest[ed] in the district court broad authority to award attorney's fees to the prevailing party." *Id.* at 1301. These facts brought the dispute within the same "'case or controversy' as the underlying litigation." *Id.*

More recently, the Seventh Circuit has drawn the jurisdictional line at whether the underlying "case has been dismissed and jurisdiction has been relinquished."

*Goyal*, 718 F.3d at 717. A court's supplemental jurisdiction in pending cases thus extends to disputes "over attorney's fees for work in underlying litigation that is already within the court's jurisdiction." *Matthews*, 264 Fed. App'x at 537–38; *see also Elusta v. City of Chicago*, 696 F.3d 690, 694 (7th Cir. 2012) ("Attorney's fee disputes are closely enough related to the underlying litigation to be the basis for supplemental jurisdiction . . . ."); *Beesen*, 2010 WL 551461, at *1 (exercising jurisdiction over lien dispute where the court possessed "jurisdiction over the subject matter of the action giving rise to the recovery against which" the lien was asserted).

Under either formulation, the Court has supplemental jurisdiction over the parties' dispute. Like *Baer*, the disputed funds are within the Court's control, and the federal statute that authorizes LaGatta's suit (the False Claims Act) contains a fee-shifting provision.[8] *Goyal* reinforces the Court's jurisdiction because judgment has not yet been entered. Finally, the dispute between Potter and her firm arose out of their joint representation of LaGatta in this case, as in *Matthews*, *Elusta*, and *Beesen*. The lien dispute thus falls inside the same "case or controversy," 28 U.S.C. § 1367(a), as LaGatta's underlying case—if only the outer permitter of it.

## II.    Potter's Motion to Stay

The third and final threshold question is whether the Court should wait to adjudicate Potter's liens. Potter insists that it should because the mediation between

---

[8] LaGatta asserts that "federal law created the fund (the fee award) that is now in contention, which supports this Court's jurisdiction to determine the liens." (Doc. 142 at 14.) But the federal law didn't create the fund; the parties' settlement agreement did. The *fact* that the False Claims Act would have allowed LaGatta's counsel to move for fees had she prevailed at trial does not mean that the statute created the disputed fund. Nevertheless, as *Baer* recognized, a negotiated settlement does not strip courts of jurisdiction over fee disputes related to that settlement. 72 F.3d at 1301.

her and Fish warrants—indeed, *mandates*—a stay. The Court sees things differently. A stay would make sense only if the Potter-Fish mediation and LaGatta's motion involved the same issues. But they do not. Nor would a stay here promote judicial economy or fairness: allowing Potter's liens to stand would do just the opposite.

Courts often stay proceedings to simplify the issues and preserve judicial resources, so long as the non-moving party suffers no undue prejudice. *See Johnson v. Navient Sols., Inc.*, 150 F. Supp. 3d 1005, 1007 (S.D. Ind. 2015) (listing factors). Ultimately, the decision is a discretionary one. *See Finova Cap. Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999). Although requests to stay are often straightforward, Potter's motion is anything but. Its complexity arises not from the parties' disagreement about the law, but from their disagreement about the facts—namely, the precise nature of their dispute. Because they don't agree on what the issues presented by LaGatta's motion are, they don't agree on whether the Potter-Fish mediation will simplify them.

In Potter's view, the dispute over her attorney's liens and her contracts with Fish are one in the same. She claims that the liens were an appropriate way for her to collect the attorney's fees to which she is entitled. (*See* Doc. 119 at 3 ("The . . . liens . . . would have been unnecessary, had Fish complied with his contractual and fiduciary obligations to provide RPA . . . with [billing records, settlement agreements, and fee distributions].").) According to Potter, any dispute over her liens is thus tantamount to a dispute over Potter's rightful share of LaGatta's settlement.

LaGatta takes a different view, characterizing the issues presented by her motion to adjudicate liens as "narrow." (Doc. 142 at 15.) She concedes that Potter's separation agreement with the firm entitled her to attorney's fees for work performed on this case. (Doc. 119-3 at 6.) She argues, however, that her motion does not require the Court to resolve "Potter's contractual dispute with Fish" or to conclusively determine "the financial relationship between them." (Doc. 142 at 3.)

LaGatta's characterization is more persuasive for three reasons. First, the text of the lien notices confirm that Potter claims "a lien and/or payment in any money . . . that *Lorine LaGatta* . . . may recover for these claims, causes of action and in this litigation." (Doc. 115-6 at 6 (emphasis added).) By their own terms, the liens encumber LaGatta's recovery—not merely the distribution of attorney's fees between Potter and Fish.[9] And by serving them on the defendants in this case, Potter interposed herself (as a private party) into the litigation and the ongoing settlement negotiations. She cannot plausibly argue that the fight over her liens is merely incidental to the contract dispute between her and Fish. That argument was foreclosed when she served lien notices on the parties to this case claiming a personal entitlement to LaGatta's recovery.

Second, Potter wrongly assumes that her right to compensation for her work on LaGatta's case rises or falls on the validity of her liens. This assumption, in turn, rests on the backwards notion that the liens were the only way to enforce her

---

[9] This was confirmed by the Joint Motion to Deposit Funds filed by Defendant Reditus Laboratories. (Doc. 132.) In it, the defendants claimed that Potter's liens prevented them from honoring the settlement agreement because the liens attached to "funds that [LaGatta] recovered for claims brought in this litigation." (Doc. 132 at 4.)

contracts with Fish. But any determination that Potter has no lien rights does not mean that she has *no rights* to LaGatta's recovery; it simply means that the liens are not a legitimate way to enforce them. As even LaGatta concedes, (*see* Doc. 122 at 12), an order invalidating Potter's liens has no bearing on whether Potter can prevail on a breach of contract claim in another forum (judicial or otherwise).

Third, the relief sought by LaGatta's motion is indeed narrow. It asks the Court to decide only whether Potter's liens are valid. (Doc. 115 at 9.) And in the many filings since, LaGatta has assured the Court that she seeks no determination of the outstanding contractual disputes between Potter and Fish. (Doc. 142 at 3.) In short, LaGatta challenges the validity of liens that were served by Potter on the defendants in this case claiming an interest in LaGatta's recovery, some of which has been deposited in the Court's registry.[10] That issue is narrower than—and distinct from—the contract dispute between Fish and Potter.

And the contract dispute between Fish and Potter is precisely what the mediation—not LaGatta's motion—is designed to resolve. Indeed, the mediation is a feature of Potter's separation agreement, which requires "any disputes between any of the Parties" be submitted to mediation. (Doc. 145 at 5.) Potter's right to be paid for her representation of LaGatta, moreover, arises from the separation agreement. Any questions about the timing and extent of that payment are thus properly addressed

---

[10] For Potter's part, the fact that a portion of the settlement funds have been deposited decreases the prejudice to LaGatta. That is because the deposit allowed the defendants with whom Potter has already settled to discharge their end of the agreement. But, as LaGatta explains, the liens "remain a live impediment to settlement" because they complicate negotiations with those defendants with whom LaGatta has not yet settled. (Doc. 142 at 5.) A stay would therefore prejudice LaGatta, albeit not to the same degree.

in mediation. LaGatta's motion, by contrast, does not raise those questions. The *fact* that Potter attempts to justify her liens by reference to the separation agreement does not transform an encumbrance on the settlement proceeds in this qui tam action into a private contract dispute. LaGatta is therefore correct to say that the mediation "is confined to resolving disputes between [Potter] and Fish arising from their separation and fee-sharing agreements." (Doc. 147 at 3.)

LaGatta offers another reason to resolve her motion now: the mediator lacks "authority to adjudicate the attorney's liens that [Potter] has filed in this proceeding" because the liens implicate LaGatta's "claims and the Court's authority." (Doc. 147 at 3.) Recall that Potter filed and served liens on Defendant Reditus Laboratories and Defendant Myriad Genetics (among others), asserting an interest in their settlement with LaGatta. But those defendants are complete strangers to the separation agreement between Fish and Potter. Nor, for that matter, is LaGatta *herself* a party to that agreement. It follows that the mediator's (or arbitrator's) decision cannot bind either LaGatta or those defendants—they never consented to be bound by it. *See Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration . . . is a matter of consent, not coercion . . . .").

Potter trots out the Federal Arbitration Act, 9 U.S.C. §§ 1–402, for the proposition that a stay of these proceedings is mandatory.[11] Because there is a valid

---

[11] Potter did not file a motion to compel arbitration, nor has Fish refused to participate in it. *See Bonzani v. Goshen Health Sys., Inc.*, 459 F. Supp. 3d 1139, 1147 (N.D. Ind. 2020) ("Under the FAA, three things are needed to compel arbitration: (1) a written arbitration agreement, (2) a dispute within the scope of the agreement, and (3) a *refusal to arbitrate* that dispute." (emphasis added)). So it is unclear whether the FAA even applies. Regardless, even assuming it does, a stay is not warranted because the dispute in this Court is not encompassed by the parties' mediation.

arbitration agreement, she says, the FAA requires a stay. This argument fails for the reasons given above. A stay in favor of arbitration is mandatory only if the arbitration clause "covers the asserted dispute." *Gore v. Alltel Comms., LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012). But as explained, the mediation concerns Fish and Potter's relative share of attorney's fees under their separation agreement; LaGatta's motion involves liens asserted against the settlement proceeds in this case.

Properly framed, the lien dispute addresses legal and factual issues distinct from the Potter-Fish mediation. A stay of these proceedings will thus serve neither judicial economy nor fairness, and Potter's Motion to Stay will be denied.[12]

## III.    LaGatta's Motion to Adjudicate Liens

Threshold issues aside, the Court turns to LaGatta's motion to adjudicate Potter's liens. (Doc. 115.) Its resolution depends on the answer to two questions: (1) whether the liens are authorized by Illinois statute, and (2) if not, whether they are valid under equitable or common-law principles.

The Court need not discuss the Illinois Attorneys Lien Act, 770 ILCS 5/1, however, because Potter has flatly disclaimed any reliance on it. Although LaGatta's motion is devoted almost entirely to explaining why the Act does not authorize the liens, (*see generally* Doc. 115 at 4–7), Potter's response pivots away from the statute and declares that she "does not rely" on it, (Doc. 119 at 6 (emphasis omitted)). Instead,

---

[12] Potter also predicts that the mediation will "likely . . . moot[] the pending actions before this court." (Doc. 145 at 4.) But the only foreseeable way that would occur is if Potter voluntarily withdrew her liens upon the conclusion of the mediation. As discussed, the mediator's resolution of the private dispute between Potter and Fish has no bearing on LaGatta's settlement, as she is not a party to the mediation. Nor does the prospect of Potter withdrawing her liens after the mediation bring the lien dispute within its scope, for the tail does not wag the dog.

17

she says that her liens are most accurately characterized as "equitable and quantum meruit liens." (Doc. 119 at 8.)[13]

Accordingly, the Court's analysis begins with whether Potter has an equitable lien. She does not; LaGatta never assigned her one. The Court then asks whether Potter's liens can be saved by her quantum meruit theory. They cannot; that theory is only available in the absence of alternative remedy, which Potter has.

## A.    Potter Has No Equitable Lien on LaGatta's Recovery

Illinois law determines whether a lawyer has an equitable lien. *See Baer*, 72 F.3d at 1301. Those liens are available when a client promises to pay their lawyer from the proceeds of the representation. But LaGatta did not promise Potter anything. Nor does any other agreement—either between Potter and the firm, or the firm and LaGatta—provide the missing link.

An attorney's lien, of course, is the "right of an attorney . . . to encumber money payable to the client until" the attorney is paid. *Attorney's Lien*, *Black's Law Dictionary* (12th ed. 2024).[14] Illinois recognizes two kinds: statutory and equitable. *Exch. Nat'l Bank*, 417 N.E.2d at 1048. Statutory liens arise by operation of law

---

[13] Had Potter relied on the Attorneys Lien Act, she would fare no better: Courts uniformly hold that the statutory liens must be perfected (that is, formally served) during the existence of the attorney-client relationship. *In re Rosebud Farm, Inc.*, 619 B.R. 202, 212 (N.D. Ill. 2020); *see also Dep't of Pub. Works v. Exch. Nat'l Bank*, 417 N.E.2d 1045, 1048 (Ill. App. Ct. 1981) ("The filing of notice of lien by an attorney during the existence of the attorney-client relationship is a prerequisite for perfecting the statutory attorney's lien."). Potter served her notices on August 6, 2025—over a year after her resignation from Fish Potter Bolaños, and a week after she formally withdrew from the case. So the Act did not authorize her liens.

[14] A "retaining lien" confers the right to retain the client's money, while a "charging lien" confers an interest in the client's future recovery. *Attorney's Lien*, *Black's Law Dictionary* (12th ed. 2024). Potter's lien (if she had one) would likely be a charging lien because she does not currently possess any part of LaGatta's recovery. Either way, the distinction is immaterial.

whenever a client hires an attorney to render legal services; they are perfected when the attorney serves notice of it on adverse parties. *See id.*; *see also* 770 ILCS 5/1. An equitable lien, by contrast, is a judicial remedy to enforce an attorney-client agreement that "fixes compensation at a certain percentage of" the client's total recovery. *Lewsader v. Wal-Mart Stores, Inc.*, 694 N.E.2d 191, 198 (Ill. App. Ct. 1998) (awarding equitable lien where client expressly granted lawyer one-third "of any amount recovered by settlement . . . or by final judgment of any court"); *see also, e.g.*, *Home Fed. Sav. & Loan Ass'n of Centralia v. Cook*, 525 N.E.2d 151, 153 (Ill. App. Ct. 1988) (same where attorneys were promised "a contingent fee of 40% of any monies recovered . . . by either settlement or jury verdict"). Thus, equitable liens require two things: (1) an express agreement between client and attorney; and (2) a contractual provision that grants the lawyer part of the client's recovery.[15]

So what is the relevant contract here? According to Potter, it's the separation agreement that she signed upon leaving the firm. (*See* Doc. 119 at 9.) But that cannot possibly supply a basis for Potter's liens—it is not an "agreement between attorney and client." *Id.* A recent decision by an Illinois appellate court illustrates the point. *See Leroy v. ERA Valdivia Contractors, Inc.*, 237 N.E.3d 1022 (Ill. App. Ct. 2023). In *Leroy*, the plaintiff signed a contingency fee agreement with a law firm to represent him. *Id.* at 1024. The law firm, in turn, outsourced some of the work to another lawyer, who was an independent contractor. *Id.* When a fee dispute arose, the lawyer

---

[15] To be sure, the agreement does not have to be in writing. *Lewsader*, 694 N.E.2d at 197. But Potter does not claim—and LaGatta flatly denies, (Doc. 115-1)—that any oral promises were made here. Potter's liens thus rise or fall on the terms of the written agreements.

served notices of attorney's liens on the defendants, claiming that "the matter ha[d] been placed in [his] hands for collection." *Id.* at 1025. But the court invalidated them, reasoning that "there must be some kind of attorney-client agreement" underlying an equitable lien. *Id.* at 1031. Because the lawyer had no agreement with the plaintiffs directly, the lien was invalid. *Id.*

The similarities between *Leroy* and this case are unmistakable. Potter, like the lawyer there, was an independent contractor for the firm representing LaGatta. Potter, like the lawyer there, performed some work on the case under an agreement with her firm. And Potter, like the lawyer there, served notices of attorney's liens on the defendants to the underlying litigation. Because Potter has no agreement with LaGatta, an indispensable requirement of an equitable lien is missing: an assignment from client to lawyer.

Were the separation agreement the only contract, the Court's analysis would end there. But it is not: Potter alternatively relies on the representation agreement between LaGatta and Fish Potter Bolaños. Section 7 of that agreement granted "a lien on any recovery for any claims for attorney's fees" arising from the representation. (Doc. 119-1 at 2.) Potter relies on Section 7 to justify her liens, but that reliance is misplaced: the only parties to the agreement were LaGatta and Fish Potter Bolaños. Nor did Potter's *membership* in the firm make her a de facto party to that agreement, and black letter corporate law illustrates why.

Fish Botter Bolaños is a professional corporation, so it closely parallels "the attributes of a traditional corporation." *Chatham Foot Specialists, P.C. v. Health Care*

*Serv. Corp.*, 837 N.E.2d 48, 59 (Ill. 2005) *see also* 805 ILCS 10/4 (incorporating Business Corporation Act into Professional Service Corporation Act). A professional corporation is thus a "distinct legal entity," *Forsyth v. Clark USA, Inc.*, 836 N.E.2d 850, 854 (Ill. App. Ct. 2005), that can enter into contracts and own property in its own name, *see Gallagher v. Reconco Builders, Inc.*, 415 N.E.2d 560, 563 (Ill. App. Ct. 1980). This would include liens, which are "property interest[s]" that "act[] as security for payment of a debt." *Constantinou v. Global Fin. Credit, LLC*, 190 N.E.3d 859, 866 (Ill. App. Ct. 2021). Yet a corporate agent does not acquire the corporation's property simply by virtue of the principal-agent relationship. To the contrary, a "basic rule[]" of corporations is that agents are "not permitted to use corporate assets for his or her own personal gain." *Crahm v. Mimms*, 444 N.E.2d 549, 556 (Ill. App. Ct. 1982). Instead, a transfer of property from corporation to agent occurs the same way it would between two individuals—that is, with a valid transaction in the form of a contract, a gift, or otherwise. *See In re SGK Ventures, LLC*, 2018 WL 3302663, No. 1:15-cv-11224, at *4 (N.D. Ill. June 19, 2018) (citing 805 ILCS 5/8.60(a)).

These principles demonstrate that Potter was not granted an equitable lien by LaGatta's representation agreement. True, Section 7 of that agreement grants a lien to the "Attorneys." (Doc. 119-1 at 2.) But the "Attorneys," is defined to include two entities: Fish Potter Bolaños and the Law Offices of Mark J. Baiocchi.[16] (Doc. 115-3 at 1.) Potter thus cannot rely on that provision because she was not a member of the class of people (or entities, rather) to whom the lien was granted. Nor does Potter's

---

[16] As LaGatta explains, Mr. Baiocchi was a solo practitioner who worked on LaGatta's case but has since passed away. (Doc. 115 at 2 n.1.)

status as a former shareholder of Fish Potter Bolaños change anything. Potter could not personally acquire the firm's lien rights unless the firm transferred them to her, which it did not.[17] Indeed, when Potter was asked to adduce evidence that LaGatta's "claim was put in the hands of Robin Potter & Associates," (Doc. 115-7 at 2), she could not. Thus, the representation agreement between LaGatta and Fish Potter Bolaños did not assign to Potter an equitable interest—or indeed, any interest at all—in LaGatta's recovery.[18]

Nor do *both* agreements magically fuse together to give Potter an equitable lien. In mathematics, if A = B and B = C, then A = C. But the transitive property does not apply to contract law. The existence of an agreement (1) between Potter and the firm, and (2) between the firm and LaGatta, does not equal (3) an agreement between Potter and LaGatta. In fact, "[t]here is a strong presumption that the parties to a contract intend that the contract's provisions apply only to them, and not to third parties." *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009) Otherwise, *Leroy* would have come out differently—the lawyer there had a contract with the firm, and the firm with the client, but the Court found no agreement between the lawyer and the client and hence no equitable lien. The absence of an agreement between Potter and LaGatta is reinforced by LaGatta's declaration that

---

[17] Potter emphasizes the fact that she had "equal voting rights" and decisionmaking authority while a member of the firm. (Doc. 119 at 3.) That may be so. But it does not alter the fact that the firm never transferred her any lien rights in LaGatta's recovery.

[18] Even if Potter prevailed on this argument, the result would not be an equitable lien. That is because an equitable lien, by definition, is a judicial *remedy* "imposed by the court to prevent unjust enrichment." *Lewsader*, 694 N.E.2d at 197. The lien granted by this contract provision is more likely an *express* lien. For the same reason, whatever Potter served on the defendants and on Fish could not be an equitable lien—only a court can impose one. Serving a lien notice and calling it an equitable lien would be like serving a demand letter and calling it a money judgment.

she "never entered into any type of agreement or contract with Robin Potter & Associates, P.C. or Robin Potter." (Doc. 115-1 at 2.)

Separately, Potter argues that she has a lien on LaGatta's recovery because Fish Potter Bolaños "assigned part of its attorney fee entitlement to" her when she broke from the firm. (Doc. 119 at 12.) This, she says, occurred when the firm promised to compensate her "for her work performed" on LaGatta's case. (Doc. 119 at 12.) But Potter's argument equates the firm's promise to pay Potter for her work on the case with an *assignment* of a portion of LaGatta's recovery. This equivalency fails for two reasons. First, as discussed, an equitable lien can arise only where the *client* has assigned the lawyer the right to their recovery, *see Cook*, 525 N.E.2d at 153; LaGatta never assigned her recovery to Potter (equitably or otherwise). Second, Illinois courts routinely distinguish an equitable assignment from a "mere promise to pay." *Id.* So even if the separation agreement could give Potter an equitable lien, the firm's promise to compensate Potter did not assign her a lien on LaGatta's recovery. *Compare id.* at 153–54 (finding equitable assignment when client agreed to pay "attorneys a contingent fee of 40% *on any monies received*" (emphasis added)), *with Exch. Nat'l Bank*, 417 N.E.2d at 1048–49 (finding no equitable assignment where client "agree[d] to pay" the lawyer "an amount equal to 28% of recovery over $132,200.00" (citation modified)). Because the separation agreement merely promised to compensate Potter using a pre-determined formula, it was not an equitable assignment.

Potter cites a series of cases to support her position, (*see* Doc. 119 at 11–12), but none of them help her. First, the court in *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.* made a passing reference to equitable attorney's liens but declined to rule on the issue because the value of the client's recovery was disputed. 184 N.E.3d 384, 396 (Ill. App. Ct. 2021). Next, Potter cites *Department of Public Works v. Exchange National Bank* for the proposition that an equitable lien requires "an express, enforceable contract that creates an equitable assignment to the attorney of a portion of the fund generated by the matter." 417 N.E.2d at 1048. That is true but incomplete: the "assignment" can only arise from a "*promise by the client*." *Id.* (emphasis added). As discussed, LaGatta never promised Potter anything. Potter also draws the Court's attention to *Rhoades v. Norfolk & Western Railway Co.*, 399 N.E.2d 969 (Ill. 1979). But *Rhoades* confronted a situation in which a client fired a lawyer and refused to honor the parties' retainer agreement. *Id.* at 975. The Court awarded the lawyer reasonable fees on a quantum meruit theory but made no mention of equitable liens. *Id.* Finally, Potter cites *White v. Beelman River Terminals, Inc.*, which involved no discussion of equitable liens and is thus inapposite. No. 5-14-0175, 2016 WL 2909188 (Ill. Ct. App. May 17, 2016).

In short, Potter is likely entitled to compensation for her work on LaGatta's case. But that right arises from Potter's separation agreement with Fish Potter Bolaños, not from any assignment made by LaGatta to Potter. That is what an equitable lien requires, and it's missing here.

### B.    Quantum Meruit Does Not Apply

At the outset, the Court is unsure what to make of the phrase "quantum meruit lien"—a phrase Potter employs several times in her opposition brief. (*See, e.g.*, Doc. 119 at 2.) Quantum meruit, as it happens, is a "cause of action" to recover the reasonable value of services rendered "where no contract exists to dictate payment." *Jameson Real Estate, LLC v. Ahmed*, 129 N.E.3d 128, 143 (Ill. App. Ct. 2018). And a cause of action is something that "authoriz[es] suits." *Devillier v. Texas*, 601 U.S. 285, 291 (2024); *see also Edwards v. McMillen Cap., LLC*, 574 F. Supp. 3d 52, 72 (D. Conn. 2021). A cause of action, by itself, does not give the plaintiff anything unless and until they vindicate it through judicial process. "Quantum meruit lien" thus carries no more meaning than would the phrase "negligence lien," or "breach of contract lien," or "fraud lien." True, a party who prevails on those claims and obtains a judgment may assert a lien to collect on the judgment. *See, e.g.*, *Water Techs. Corp. v. Calco, Ltd.*, 132 F.R.D. 670, 675 (N.D. Ill. 1990). But that is not what happened here: Potter never reduced her quantum meruit cause of action (assuming she has one) to an enforceable judgment through formal adjudication. Instead, she served notices of her liens and then invoked quantum meruit as a post hoc justification for them. That said, at least two Illinois courts have considered quantum meruit theories in similar contexts. *See Lewsader*, 694 N.E.2d at 199; *Leroy*, 237 N.E.3d at 1030. So this Court will too.

Potter's quantum meruit theory fails at step one. That is because quantum meruit is available only when "no contract exists to dictate payment." *Ahmed*, 129

N.E.3d at 143. Here, there *is* a contract that dictate's Potter's payment: the separation agreement that she signed when she left Fish Potter Bolaños, which provides that she will receive "her proportional lodestar for work performed" on LaGatta's case if and when it "results in fees to" the firm. (Doc. 119-3 at 6.) Indeed, Potter's response leans heavily on the "contracts and enforceable agreements in issue" to justify her liens. (Doc. 119-1 at 14.) But it makes little sense to say that Potter has "quantum meruit liens" *as a result* of her agreements with Fish and his firm; quantum meruit is only available *in the absence* of an agreement. *See Ahmed*, 129 N.E.3d at 143; *see also Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 917 (Ill. App. Ct. 2004) ("When a contract exists between the parties, no quasi-contractual claim, such as *quantum meruit*, can arise.").[19]

Even assuming that no agreement existed, quantum meruit would not save Potter's liens. "To recover under a *quantum meruit* theory, a plaintiff must prove that (1) it performed a service to the benefit of the defendant, (2) it did not perform the service gratuitously, (3) the defendant accepted this service, and (4) no written contract existed to prescribe payment for this service." *Ahmed*, 129 N.E.3d at 143.

---

[19] To be clear, there is no agreement between Potter and *LaGatta*, which is partially why Potter has no equitable lien on LaGatta's recovery. *See supra* Part III. And in general, the cases that discuss quantum meruit involve the person who rendered the service and the person who accepted it. (Likely because it is a cause of action that service providers bring against the recipients.) But the "agreement" need not be between those two people. Instead, there must be an "express contract on which the *quantum meruit* claim rests." *K. Miller Const. Co. v. McGinnis*, 913 N.E.2d 1147, 1153 (Ill. App. Ct. 2009), *rev'd on other grounds*, 938 N.E.2d 471; *see also Klesman & Assocs., Inc. v. Weatherco, Inc.*, 92 F. Supp. 2d 765, 768 (N.D. Ill. 2000) ("Where, as in this case, services are performed pursuant to a contract, a third party is not liable on the basis of an implied understanding even if it is benefitted by the work." (citation modified)). As Potter sees things, her right to compensation arises from—and should be calculated in accordance with—her separation agreement with Fish and her former firm. (*See* Doc. 119 at 13.) Her quantum meruit claim thus "rests" on that agreement and is foreclosed by it.

Putting aside element four, Potter could theoretically argue that (1) she performed a beneficial service for LaGatta, (2) she did so expecting to be paid, and (3) LaGatta accepted the service. Yet, even if Potter could prevail on the merits, the appropriate *remedy* is not a lien on LaGatta's recovery. Instead, "[i]n a *quantum meruit* action the measure of recovery is the reasonable value of the work performed." *Id.*; *see also, e.g.*, *Andrew W. Levenfeld & Assocs., Ltd. v. O'Brien*, 248 N.E.3d 1053, 1066 (Ill. 2024) (holding that quantum meruit results in an award of "the reasonable value of the discharged attorney's services"); *Seiden Law Grp., P.C. v. Segal*, 202 N.E.3d 343, 356 (Ill. App. Ct. 2021) (same); *Lee v. Ingalls Mem'l Hosp.*, 597 N.E.2d 747, 749 (Ill. App. Ct. 1992) (same). Even if Potter prevailed on her quantum meruit theory, she would be entitled to a judgment for the reasonable value of the services performed for LaGatta—not an attorney's lien.

Accordingly, Potter cannot rely on quantum meruit because there is an express agreement. And even if she could prevail on that theory, an attorney's lien would not be the appropriate remedy.

## CONCLUSION

IT IS THEREFORE ORDERED that Potter's Motion to Stay, (Doc. 145), is DENIED. LaGatta's Motion to Adjudicate and Declare Invalid Attorney's Liens, (Doc. 115), is GRANTED. Neither Robin Potter nor Robin Potter & Associates possess a valid lien. Should LaGatta move for disbursement of the funds currently in the Court's registry, she should do so in accordance with the procedures set forth in Section IV(A) of the Court's Standing Order CDIL-9: *Order Regarding Deposit,*

*Investment, and Disbursement of Registry Funds*. The Court's ruling on LaGatta's

Rule 11 Motion for Sanctions, (Doc. 127), is forthcoming.

*So ordered.*

Entered this 30th day of January 2026.

s/ Ronald L. Hanna
_____

Ronald L. Hanna
United States Magistrate Judge
